# Exhibit A

The New York Times | https://www.nytimes.com/2022/05/25/us/politics/pro-trump-lawyers-elector-scheme.html

**Democracy Challenged: A Look at the Historic Test on Democratic Norms ›**

# Intensifying Inquiry Into Alternate Electors Focuses on Trump Lawyers

In recent subpoenas, federal prosecutors investigating alternate slates of pro-Trump electors sought information about Rudolph W. Giuliani, John Eastman and others.

By Alan Feuer, Katie Benner and Luke Broadwater

May 25, 2022

The Justice Department has stepped up its criminal investigation into the creation of alternate slates of pro-Trump electors seeking to overturn Joseph R. Biden Jr.'s victory in the 2020 election, with a particular focus on a team of lawyers that worked on behalf of President Donald J. Trump, according to people familiar with the matter.

A federal grand jury in Washington has started issuing subpoenas in recent weeks to people linked to the alternate elector plan, requesting information about several lawyers including Mr. Trump's personal lawyer Rudolph W. Giuliani and one of his chief legal advisers, John Eastman, one of the people said.

The subpoenas also seek information on other pro-Trump lawyers like Jenna Ellis, who worked with Mr. Giuliani, and Kenneth Chesebro, who wrote memos supporting the elector scheme in the weeks after the election.

A top Justice Department official acknowledged in January that prosecutors were trying to determine whether any crimes were committed in the scheme.

Under the plan, election officials in seven key swing states put forward formal lists of pro-Trump electors to the Electoral College on the grounds that the states would be shown to have swung in favor of Mr. Trump once their claims of widespread election fraud had been accepted. Those claims were baseless, and all seven states were awarded to Mr. Biden.

It is a federal crime to knowingly submit false statements to a federal agency or agent for an undue end. The alternate elector slates were filed with a handful of government bodies, including the National Archives.

The focus on the alternate electors is only one of the efforts by the Justice Department to broaden its vast investigation of hundreds of rioters who broke into the Capitol on Jan. 6, 2021.

In the past few months, grand jury subpoenas have also been issued seeking information about a wide array of people who organized Mr. Trump's rally near the White House that day, and about any members of the executive and legislative branches who may have taken part in planning the event or tried to obstruct the certification of the 2020 election.

The widening and intensifying Justice Department inquiry also comes as the House select committee investigating the efforts to overturn the election and the Jan. 6 assault prepares for public hearings next month.

The subpoenas in the elector investigation are the first public indications that the roles of Mr. Giuliani and other lawyers working on Mr. Trump's behalf are of interest to federal prosecutors.

After Election Day, Mr. Giuliani and Ms. Ellis appeared in front of a handful of legislatures in contested swing states, laying out what they claimed was evidence of fraud and telling lawmakers that they had the power to pick their own electors to the Electoral College.

Mr. Eastman was an architect of a related plan to pressure Vice President Mike Pence to use the alternate electors in a bid to block or delay congressional certification of Mr. Biden's victory.

Examining the lawyers who worked with Mr. Trump after the election edges prosecutors close to the former president. But there is no guarantee that an investigation of the lawyers working on the alternate elector plan would lead prosecutors to discover any evidence that Mr. Trump broke the law.

The plot to use alternate electors was one of the most expansive and audacious schemes in a dizzying array of efforts by Mr. Trump and his supporters to deny his election loss and keep him in the White House.



John Eastman, a lawyer advising Mr. Trump, was an architect of a plan to pressure Vice President Mike Pence to use alternate electors in a bid to block Joseph R. Biden Jr.'s victory.  Anna Moneymaker/The New York Times

It began even before some states had finished counting ballots, as officials in places like Arizona, Georgia and Wisconsin came under pressure to create slates of electors announcing that Mr. Trump had won.

The scheme reached a crescendo in the days leading up to Jan. 6, when Mr. Trump and his allies mounted a relentless campaign to persuade Mr. Pence to accept the alternate electors and use them at a joint session of Congress to deny — or at least delay — Mr. Biden's victory.

At various times, the plan involved state lawmakers and White House aides, though prosecutors seem to believe that a group of Mr. Trump's lawyers played a crucial role in carrying it out. Investigators have cast a wide net for information about the lawyers, but prosecutors believe that not all of them may have supported the plans that Mr. Trump's allies created to keep him in office, according to one of the people familiar with the matter.

Mr. Giuliani's lawyer said he was unaware of any investigation into his client. Mr. Eastman's lawyer and Ms. Ellis did not return emails seeking comment. Mr. Chesebro declined to answer questions about the inquiry.

The strategy of pushing the investigation forward by examining the lawyers' roles could prove to be tricky. Prosecutors are likely to run into arguments that some — or even much — of the information they are seeking is protected by attorney-client privilege. And there is no indication that prosecutors have sought to subpoena the lawyers or search their property.

"There are heightened requirements for obtaining a search warrant on a lawyer," said Joyce Vance, a former U.S. attorney in Alabama. "Even when opening a case where a lawyer could be a subject, prosecutors will flag that to make sure that people consider the rights of uninvolved parties."

As a New York real estate mogul, Mr. Trump had a habit of employing lawyers to insulate himself from queries about his questionable business practices and personal behavior. In the White House — especially in times of stress or scandal — he often demanded loyalty from the lawyers around him, once asking in reference to a mentor and famous lawyer known for his ruthlessness, "Where's my Roy Cohn?"

Some of the lawyers who have come under scrutiny in connection with the alternate elector scheme are already facing allegations of professional impropriety or misconduct.

In June, for instance, Mr. Giuliani's law license was suspended after a New York court ruled that he had made "demonstrably false and misleading statements" while fighting the election results on Mr. Trump's behalf. Boris Epshteyn, another lawyer who worked with Mr. Giuliani, has also come under scrutiny in the Justice Department investigation, the people familiar with the matter said.

Two months before Mr. Giuliani's license was suspended, F.B.I. agents conducted extraordinary searches of his home and office in New York as part of an unrelated inquiry centered on his dealings in Ukraine before the 2020 election, when he sought to damage Mr. Biden's credibility.

In March, a federal judge in California ruled in a civil case that Mr. Eastman had most likely conspired with Mr. Trump to obstruct Congress and defraud the United States by helping to devise and promote the alternate elector scheme, and by presenting plans to Mr. Pence suggesting that he could exercise his discretion over which slates of electors to accept or reject at the Jan. 6 congressional certification of votes.



There is no guarantee that an investigation of the lawyers working on the alternate elector plan would lead prosecutors to discover evidence that Mr. Trump broke the law.  Maddie McGarvey for The New York Times

The scheme, which involved holding meetings and drafting emails and memos, was "a coup in search of a legal theory," wrote the judge, David O. Carter of the Central District of California.

It was revealed this month that Mr. Eastman was involved in a similar — but perhaps even more brazen — effort to overturn to the election results. According to emails released by a public records request, Mr. Eastman pressed a Pennsylvania state lawmaker in December 2020 to carry out a plan to strip Mr. Biden of his win in that state by essentially retabulating the vote count in a way that would favor Mr. Trump.

A week before the disclosure of Mr. Eastman's emails, Ms. Ellis was accused of misconduct in an ethics complaint submitted to court officials in Colorado, her home state.

The complaint, by the bipartisan legal watchdog group the States United Democracy Center, said that Ms. Ellis had made "numerous public misrepresentations" while traveling the country with Mr. Giuliani after the election in an effort to persuade local lawmakers that the voting had been marred by fraud.

It also noted that Ms. Ellis had assisted Mr. Trump in an "unsuccessful and potentially criminal effort" to stave off defeat by writing two memos arguing that Mr. Pence could ignore the electoral votes in key swing states that had pledged their support to Mr. Biden.

As for Mr. Chesebro, he was involved in what may have been the earliest known effort to put on paper proposals for preparing alternate electors.

A little more than two weeks after Election Day, Mr. Chesebro sent a memo to James Troupis, a lawyer for the Trump campaign in Wisconsin, laying out a plan to name pro-Trump electors in the state. In a follow-up memo three weeks later, Mr. Chesebro expanded on the plan, setting forth an analysis of how to legally authorize alternate electors in six key swing states, including Wisconsin.

The two memos, obtained by The New York Times, were used by Mr. Giuliani and Mr. Eastman, among others, as they developed a strategy intended to pressure Mr. Pence and to exploit ambiguities in the Electoral Count Act, according to a person familiar with the matter.

Alan Feuer covers extremism and political violence. He joined The Times in 1999. @alanfeuer

Katie Benner covers the Justice Department. She was part of a team that won a Pulitzer Prize in 2018 for public service for reporting on workplace sexual harassment issues. @ktbenner

Luke Broadwater covers Congress. He was the lead reporter on a series of investigative articles at The Baltimore Sun that won a Pulitzer Prize and a George Polk Award in 2020. @lukebroadwater

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: U.S. Is Said to Step Up Trump Electors Inquiry

## Democracy Challenged: A Look at the Historic Test on Democratic Norms ›

Key coverage on the challenges to democracy:

Voters see democracy in peril, but saving it isn't a priority, a Times/Siena poll found.

Election officials are preparing for challenges as right-wing leaders mobilize a national corps of activists.

Over 370 Republican Candidates Have Cast Doubt on the 2020 Election

Misinformation swirls in non-English languages ahead of the midterm elections.

Exhibit B

**The New York Times** | https://www.nytimes.com/2022/07/25/us/politics/marc-short-pence-jan-6.html

## Top Pence Aides Testify to Grand Jury in Jan. 6 Investigation

Marc Short, who was chief of staff to Vice President Mike Pence, and Greg Jacob, a lawyer for Mr. Pence, were subpoenaed in the Justice Department's expanding criminal inquiry.

**By Alan Feuer and Maggie Haberman**

July 25, 2022

> **Sign Up for On Politics, for Times subscribers only.**  A Times reader's guide to the political news in Washington and across the nation. Get it in your inbox.

Two top aides to former Vice President Mike Pence testified last week to a federal grand jury in Washington investigating the events surrounding the Jan. 6 attack on the Capitol, the highest-ranking officials of the Trump administration so far known to have cooperated with the Justice Department's widening inquiry into the events leading up to the assault.

The appearances before the grand jury of the men — Marc Short, who was Mr. Pence's chief of staff, and Greg Jacob, who was his counsel — were the latest indication that the Justice Department's criminal investigation into the events surrounding and preceding the riot is intensifying after weeks of growing questions about the urgency the department has put on examining former President Donald J. Trump's potential criminal liability.

The testimony of the two Pence aides marked the first time it has become publicly known that figures with firsthand knowledge of what took place inside the White House in the tumultuous days before the attack have cooperated with federal prosecutors.

Both Mr. Short and Mr. Jacob played important roles in describing to a House select committee conducting a parallel investigation of the Capitol attack how Mr. Trump, working with allies like the lawyer John Eastman, mounted a campaign to pressure Mr. Pence into disrupting the normal counting of Electoral College votes on Jan. 6, 2021, as part of an effort to keep Mr. Trump in office.

Mr. Short's testimony was confirmed by two people familiar with it, as was Mr. Jacob's.

The Justice Department has at times appeared to be lagging behind the House select committee, which has spoken to more than 1,000 witnesses, including some from inside the Trump White House. Much of that testimony has been highlighted at a series of public hearings over the past two months.

It remains unclear precisely what Mr. Short and Mr. Jacob told the grand jury or what questions prosecutors may have asked them. But both previously gave recorded and transcribed interviews to the House committee, and Mr. Jacob served as a live witness at one of the panel's public hearings that focused on the effort to strong-arm Mr. Pence.

Mr. Short and Mr. Jacob were present in the Oval Office for a meeting on Jan. 4, 2021, at which Mr. Trump had Mr. Eastman try to persuade Mr. Pence that he could delay or block congressional certification of Mr. Trump's Electoral College defeat.

Mr. Eastman's plan relied on Mr. Pence being willing to accept, as he presided over a joint session of Congress on Jan. 6, that there were disputes over the validity of electors whose votes for Joseph R. Biden Jr. had already been certified by the states — a baseless assertion that had been promoted by a number of Trump allies in the previous weeks as a last-ditch way to help keep Mr. Trump in office.

Mr. Pence ultimately rejected Mr. Trump's pressure on him to go along. But the so-called fake electors proposal has been one of the primary lines of inquiry to have become public in the Justice Department's sprawling investigation.

Mr. Short also provided the House committee with testimony that highlighted the sense of threat that built from Mr. Trump's efforts to derail the congressional proceedings on Jan. 6.

He told the House committee how he had informed Mr. Pence's lead Secret Service agent on Jan. 5, 2021, that Mr. Trump was about to publicly turn on Mr. Pence over his refusal to go along with the electors plan, potentially placing a target on his former boss's back. On Jan. 6, some members of the mob of Trump supporters that attacked the Capitol chanted "Hang Mike Pence!" Mr. Trump reacted approvingly to the chants, effectively saying that Mr. Pence deserved it, according to testimony collected by the House committee.

Mr. Short's testimony to the federal grand jury was reported earlier by ABC News. Mr. Jacob's testimony was reported earlier by The Wall Street Journal.

Until now, the only other pro-Trump figure — aside from rioters who were at the Capitol — known to have testified in front of a federal grand jury investigating Jan. 6 was the prominent "Stop the Steal" organizer Ali Alexander. Mr. Alexander, acting on a subpoena from prosecutors, answered questions in front of the grand jury for about three hours in late June.

Prosecutors have also issued grand jury subpoenas to several people connected to the scheme to create false slates of electors saying that Mr. Trump won the 2020 election in swing states that were actually won by Mr. Biden. Those who have received the subpoenas have largely been state lawmakers or Republican officials, many of whom put their names on documents attesting to the fact that they were electors for Mr. Trump.

The subpoenas, some of which have been obtained by The New York Times, show that prosecutors are interested in collecting information on a group of pro-Trump lawyers who helped to devise and carry out the plan.

Among the lawyers named in the subpoenas are Rudolph W. Giuliani, who helped oversee Mr. Trump's challenges to the election, and Mr. Eastman, an outside lawyer who drafted several memos encouraging Mr. Trump to use the fake electors as part of the campaign to pressure Mr. Pence to throw him the election.

Last month, federal agents stopped Mr. Eastman outside a restaurant in New Mexico and seized his cellphone. That same day, agents also seized electronic devices from another lawyer involved in the fake elector scheme, Jeffrey Clark. Mr. Clark, a former Justice Department official, helped draft a letter to state officials in Georgia falsely stating that the department had evidence of election fraud in the state.

If the grand jury testimony of Mr. Short and Mr. Jacob echoed their interviews with the House committee, it suggests that prosecutors have likely homed in how Mr. Trump and his allies sought to pressure Mr. Pence into ignoring or refusing to accept some slates of electors as he oversaw the final certification of the election.

The effort to pressure Mr. Pence into derailing certification of the Electoral College results was the chief focus of one of the House committee's hearings in June.

The panel provided evidence at the hearing that Mr. Trump went along with the scheme despite having been told it was illegal. At the hearing, the committee played videotaped testimony in which Mr. Jacob said that Mr. Eastman had admitted in front of Mr. Trump at the Jan. 4 meeting — two days before the riot — that his plan to have Mr. Pence obstruct the electoral certification violated the Electoral Count Act.

Mr. Jacob testified to the committee that Mr. Pence knew early on that the plan was unlawful. Mr. Pence's first reaction upon hearing of it, Mr. Jacob said, was that there was "no way" this was "justifiable."

The pressure campaign against Mr. Pence by Mr. Trump and Mr. Eastman also played a central role in a court decision this spring by a federal judge in California who said that Mr. Trump and Mr. Eastman had most likely committed federal crimes such as obstruction of a congressional proceeding and conspiracy to defraud the United States.

In the decision, which emerged from Mr. Eastman's attempts to the stop the House panel from gaining access to his emails, the judge, David O. Carter, noted that Mr. Trump had facilitated two meetings in the days before Jan. 6 that were "explicitly tied to persuading Vice President Pence to disrupt the joint session of Congress."

At the first meeting, on Jan. 4, Mr. Trump and Mr. Eastman invited Mr. Pence, Mr. Short and Mr. Jacob to the Oval Office. There, Judge Carter wrote, Mr. Eastman "presented his plan to Vice President Pence, focusing on either rejecting electors or delaying the count."

That meeting was followed by another, Judge Carter wrote, on Jan. 5, during which Mr. Eastman sought again to persuade Mr. Jacob to go along with the scheme.

"Dr. Eastman and President Trump launched a campaign to overturn a democratic election, an action unprecedented in American history," Judge Carter wrote.

Exhibit C

**The New York Times** | https://www.nytimes.com/2022/08/02/us/politics/pat-cipollone-subpoena.html

# Justice Dept. Subpoenas Pat Cipollone, Trump White House Counsel

Mr. Cipollone is the highest-ranking White House official in the lead-up to Jan. 6 who is known to have been called to testify by federal investigators.

 

**By Maggie Haberman and Luke Broadwater**

Aug. 2, 2022

> **Sign Up for On Politics, for Times subscribers only.** A Times reader's guide to the political news in Washington and across the nation. Get it in your inbox.

Pat A. Cipollone, the White House counsel under former President Donald J. Trump who tried to stop some of his more extreme efforts to overturn the 2020 election, has been subpoenaed by a federal grand jury investigating activities in the lead-up to the Capitol riot on Jan. 6, 2021, a person familiar with the subpoena said.

It was unclear which grand jury had called Mr. Cipollone to testify as a witness. Two are known to be hearing evidence and testimony — one looking at the scheme by some of Mr. Trump's lawyers and advisers to assemble slates of electors who would falsely claim that Mr. Trump was the actual winner of the election, and another focused on the events of Jan. 6.

But Mr. Cipollone is the highest-ranking White House official working for Mr. Trump during his final days in office who is known to have been called to testify by federal investigators.

He was in the West Wing as Mr. Trump's supporters violently stormed the Capitol and the president refused repeatedly to call them off. Mr. Cipollone also attended several meetings in the run-up to the riot in which Mr. Trump and his allies discussed how they could overturn the election and keep him in office.

Mr. Cipollone repeatedly pushed back on those efforts.

The subpoena was reported earlier by ABC News. An aide to Mr. Cipollone did not immediately respond to requests for comment. A spokesman for the Justice Department declined to comment.

Mr. Cipollone's appearance has been requested at a time when federal prosecutors are sharpening their focus on the conduct of Mr. Trump, and not simply the people who were advising him.

In recent weeks, investigators have asked witnesses questions about Mr. Trump and his actions, including of people who worked in the White House. Two former senior advisers to Vice President Mike Pence — his chief of staff, Marc Short, and his chief counsel, Greg Jacob — recently testified before one of the grand juries, according to people familiar with their appearances.

Given the nature of Mr. Cipollone's job, it was unclear how much information he would provide. He was subpoenaed by the House committee investigating the Jan. 6 riot and the events that helped precipitate it, and sat for a transcribed, recorded interview.

But certain terms were discussed ahead of time, and Mr. Cipollone, citing attorney-client and executive privilege, declined to discuss specific conversations with Mr. Trump.

Mr. Cipollone was a witness to some of the most significant moments in Mr. Trump's push to overturn the election results, including discussions about seizing voting machines, meddling in the Justice Department and sending false letters to state officials about election fraud.

"That's a terrible idea for the country," he said of suggestions that the Trump administration seize voting machines, adding, "That's not how we do things in the United States."

Mr. Cipollone was also in direct contact with Mr. Trump on Jan. 6 as rioters stormed the Capitol and told the House committee he believed more should have been done to call off the mob.

"I think I was pretty clear there needed to be an immediate and forceful response, statement, public statement, that people need to leave the Capitol now," Mr. Cipollone testified.

Katie Benner contributed reporting.

# Exhibit D

# POLITICO

**EXCLUSIVE**

## Justice Department subpoenas Trump White House lawyer Eric Herschmann

He's the latest onetime top aide to the former president to receive a summons from a federal grand jury investigating the Jan. 6 attack.



Eric Herschmann represented Donald Trump in the former president's first impeachment trial and later joined the White House as a senior adviser. | Senate Television via Getty Images

By **BETSY WOODRUFF SWAN**
08/15/2022 01:26 PM EDT
Updated: 08/15/2022 01:34 PM EDT

   

A federal grand jury investigating the Jan. 6 attack has subpoenaed Trump White House lawyer Eric Herschmann for documents and testimony, according to a person familiar with the matter.

Herschmann represented Donald Trump in the former president's first impeachment trial and later joined the White House as a senior adviser. He did not work in the White House counsel's office, but did provide Trump with legal advice. Because of that responsibility, there will likely be litigation over the scope of the subpoena and over how executive and attorney-client privileges may limit Herschmann's ability to comply.

AD

Herschmann is not the first former Trump White House lawyer to receive a DOJ subpoena. Pat Cipollone, who served as White House counsel, and Patrick Philbin, who served as deputy counsel, have also been subpoenaed.

During the tumultuous final weeks of Trump's term, Herschmann clashed with other aides and advisers who pushed the defeated president to fight the election results. He was also present for many of the most consequential meetings in that period of time. Among them was a high-stakes meeting where most of the Trump Justice Department's top brass threatened to resign rather than work under a colleague who wanted to advance spurious claims of widespread voter fraud.

Herschmann also sparred with Sidney Powell and Michael Flynn when they urged Trump to have the military seize voting machines. The Jan. 6 select committee has aired numerous portions of his testimony to their panel, which is blunt and sometimes darkly amusing.

A spokesperson for Herschmann declined to comment. The Justice Department declined to comment.

In his testimony to the select committee, Herschmann described lambasting Jeffrey Clark, then a top Justice Department lawyer, during a White House meeting on Jan. 3, 2021. At that time, Herschmann told the committee, Clark was urging Trump to remove then-Acting Attorney General Jeff Rosen and give him the job.

AD

Clark had encouraged his DOJ colleagues to send letters to state legislators saying the department had found concerning evidence of voter fraud in the 2020 election. Former Attorney General Bill Barr, however, had said the department found no evidence of fraud that could have swung the election. Under those circumstances, Clark's plans so concerned his colleagues that many of them warned Trump in that Jan. 3 meeting that they would quit if he gave Clark the top job.

Herschmann later recalled to the select panel that he found Clark's idea to be "asinine" and dryly brought up Clark's past as an environmental lawyer.

"I thought Jeff's proposal — Clark's proposal was nuts," Herschmann told the committee. "I mean this guy, at a certain point, 'Listen, the best I can tell is the only thing you know about environmental and elections challenges is they both start with E. And based on your answers tonight, I'm not even certain you know that.'"

Herschmann also told the select panel about a contentious phone call he had on Jan. 7, 2021, with Trump-allied lawyer John Eastman. In the call, Eastman discussed plans to keep pursuing Trump's efforts to reverse the election — despite the violence of the previous day's Capitol riot.

"And I said to him, 'Are you out of your F-ing mind?'" Herschmann told the panel. "I said, 'I only want to hear two words coming out of your mouth from now on: orderly transition.'"

Eastman finally said those words, according to Herschmann.

"I said, 'Good, John. Now I'm going to give you the best free legal advice you're ever getting in your life: Get a great F-ing criminal defense lawyer. You're going to need it,'" Herschmann added. "And then I hung up on him."

*CORRECTION: Due to an editing error, a previous version of this report misspelled Sidney Powell's first name.*

**FILED UNDER:** DEPARTMENT OF JUSTICE, DONALD TRUMP, DONALD TRUMP 2020, 



**Huddle**

A play-by-play preview of the day's congressional news

**EMAIL**

Your Email

**INDUSTRY**

Select Industry

\* All fields must be completed to subscribe.

SIGN UP

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our **privacy policy** and **terms of service.** You can unsubscribe at any time and can **contact us here.** This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.

**SPONSORED CONTENT**                                      Recommended by



**[Photos] Alexandria Ocasio's New**

http://sportpirate.com/



**Urologist: Men With An Enlarged Prostate Do Not**

GorillaSecret.com



**Maryland: Say Bye To Your Home Insurance Bill If**

provide-homeowners-savings.com



**Top US Men's Surgeon: Do This Once Daily To**

medicalhelp.me



**The Best States to Retire in 2022**

SmartAsset

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

---

© 2022 POLITICO LLC

Exhibit E

The Washington Post

*Democracy Dies in Darkness*

**LEGAL ISSUES**

# Trump White House counsel Cipollone appears before Jan. 6 grand jury

The former top lawyer at the White House is the highest-ranking aide to go before grand jury in Justice Department criminal probe of Trump's actions amid efforts to overturn the 2020 election

By Spencer S. Hsu

Updated September 2, 2022 at 3:03 p.m. EDT   |   Published September 2, 2022 at 11:57 a.m. EDT

**CORRECTION**

An earlier version of this article incorrectly identified Cassidy Hutchinson as a former aide to Trump White House counsel Pat Cipollone. She was an aide to Trump chief of staff Mark Meadows. The article has been corrected.

Former Trump White House counsel Pat Cipollone and his deputy Pat Philbin appeared before a federal grand jury investigating the Jan. 6, 2021, attack on the U.S. Capitol, Friday — spending about four hours behind closed doors with jurors and prosecutors.

Cipollone became the highest-ranking White House aide known to appear before the grand jury in the Justice Department's criminal investigation of efforts to overturn the 2020 election results, including former president Donald Trump's actions, that culminated in the siege of Congress as lawmakers met to confirm President Biden's election victory. Cipollone spent about 2½ hours with grand jurors and Philbin about 1½ hours.

Cipollone, Philbin and their attorney, Michael M. Purpura, declined to comment to reporters while entering and leaving court about their testimony or whether prosecutors steered clear of private presidential communications typically subject to executive and attorney-client privilege.

Cipollone was greeted upon arrival Friday morning at the federal courthouse in Washington by lead federal prosecutor Thomas Windom, who escorted him to the grand jury meeting area.

The two attorneys received federal grand jury subpoenas for testimony and documents, CNN reported on Aug. 3. Their expected appearance Friday was reported by ABC News, and it followed grand jury appearances in July by former vice president Mike Pence's former chief of staff, Marc Short, and attorney Greg Jacob.

Cipollone was the top White House lawyer at the end of the Trump administration. He has emerged in several public accounts as a key witness to and critic of conversations held by the then-president with private lawyers and others in his inner circle who allegedly sought to substitute Trump allies for certified electors from some states Biden won. Conversations also included pressuring the Justice Department to falsely claim the election was rigged with fraudulent votes cast or propose the seizure of voting machines by the U.S. attorney general, secretary of defense or other federal officials.

In videotaped testimony played at televised hearings this summer held by the House select committee investigating events leading to the Capitol breach, Cipollone told investigators that he vigorously resisted efforts by Trump and outside advisers to undo the election, and that he, like former Trump attorney general William P. Barr, did not believe there was sufficient fraud to have affected the outcome of Biden's victory in any state.

At a late-night meeting at the White House on Dec. 18, 2020, that Cipollone termed "unhinged," for instance, he said election lawyer Sidney Powell and former national security adviser Michael Flynn exhibited a "general disregard for backing what you actually say with facts."

Of the conspiracy-fueled notion to seize voting machines, Cipollone recalled telling Powell, "I don't understand why we even have to tell you why that's a bad idea, it's a terrible idea for the country."

Cipollone also has been described as opposing the sending of a letter drafted by attorney Jeffrey Bossert Clark to officials in Georgia, falsely declaring that the Justice Department had "identified significant concerns that may have impacted the outcome of the election in multiple states."

Cipollone told Trump that Clark's proposed letter was "a murder-suicide pact" that would "damage everyone who touches it," according to a deposition by then-deputy attorney general Richard Donoghue. In a call on Dec. 27, 2020, witnesses have said, Trump told acting attorney general Jeffrey Rosen that he wanted the department to say there was significant election fraud, and said he was poised to oust Rosen and replace him with Clark, who was willing to make that assertion.

"Just say the election was corrupt and leave the rest to me and the Republican congressmen," Trump told Rosen, according to notes of the conversation reported by the Senate Judiciary Committee.

Trump backed down after Rosen, Donoghue and Cipollone refused and said they and other senior government lawyers would resign en masse, participants have said.

Cipollone answered questions for eight hours before the House Jan. 6 committee earlier this year, following riveting testimony by Cassidy Hutchinson, a top aide to former Trump chief of staff Mark Meadows, who described her boss as one of the last firewalls blocking Trump's efforts to subvert the election results.

She testified that on the morning of Jan. 6, Cipollone warned her in words she paraphrased as " 'Please make sure we don't go up to the Capitol, Cassidy. Keep in touch with me. We're going to get charged with every crime imaginable if we make that movement happen.' "

Exhibit F

**The New York Times** | https://www.nytimes.com/2022/09/12/us/politics/trump-aides-jan-6-doj.html

# Justice Dept. Issues 40 Subpoenas in a Week, Expanding Its Jan. 6 Inquiry

It also seized the phones of two top Trump advisers, a sign of an escalating investigation two months before the midterm elections.

**By Glenn Thrush, Maggie Haberman, Adam Goldman and Alan Feuer**

Sept. 12, 2022

> **Sign Up for On Politics, for Times subscribers only.** A Times reader's guide to the political news in Washington and across the nation. Get it in your inbox.

WASHINGTON — Justice Department officials have seized the phones of two top advisers to former President Donald J. Trump and blanketed his aides with about 40 subpoenas in a substantial escalation of the investigation into his efforts to subvert the 2020 election, people familiar with the inquiry said on Monday.

The seizure of the phones, coupled with a widening effort to obtain information from those around Mr. Trump after the 2020 election, represent some of the most aggressive steps the department has taken thus far in its criminal investigation into the actions that led to the Jan. 6, 2021, assault on the Capitol by a pro-Trump mob.

The extent of the investigation has come into focus in recent days, even though it has often been overshadowed by the government's legal clash with Mr. Trump and his lawyers over a separate inquiry into the handling of presidential records, including highly classified materials, the former president kept at his residence in Florida, Mar-a-Lago.

Federal agents with court-authorized search warrants took phones last week from at least two people: Boris Epshteyn, an in-house counsel who helps coordinate Mr. Trump's legal efforts, and Mike Roman, a campaign strategist who was the director of Election Day operations for the Trump campaign in 2020, people familiar with the investigation said.

Mr. Epshteyn and Mr. Roman have been linked to a critical element of Mr. Trump's bid to hold onto power: the effort to name slates of electors pledged to Mr. Trump from swing states won by Joseph R. Biden Jr. in 2020 as part of a plan to block or delay congressional certification of Mr. Biden's Electoral College victory.

Mr. Epshteyn and Mr. Roman did not respond to requests for comment. A Justice Department spokesman declined to comment.

The names of those receiving the latest round of subpoenas in the investigation related to Jan. 6 have dribbled out gradually, with investigators casting a wide net on a range of issues, including Mr. Trump's postelection fund-raising and the so-called fake electors scheme.

One of the recipients, people familiar with the case said, was Dan Scavino, Mr. Trump's former social media director who rose from working at a Trump-owned golf course to become one of his most loyal West Wing aides, and has remained an adviser since Mr. Trump left office. Stanley Woodward, one of Mr. Scavino's lawyers, declined to comment.

Another was Bernard B. Kerik, a former New York City police commissioner. Mr. Kerik, who promoted claims of voter fraud alongside his friend Rudolph W. Giuliani, was issued a subpoena by prosecutors with the U.S. attorney's office in Washington, his lawyer, Timothy Parlatore, said on Monday. Mr. Parlatore said his client had initially offered to grant an interview voluntarily.

The subpoenas seek information in connection with the fake electors plan.

For months, associates of Mr. Trump have received subpoenas related to other aspects of the investigations into his efforts to cling to power. But in a new line of inquiry, some of the latest subpoenas focus on the activities of the Save America political action committee, the main political fund-raising conduit for Mr. Trump since he left office.

The fact that the Justice Department is now seeking information related to fund-raising comes as the House committee examining the Jan. 6 attack has raised questions about money Mr. Trump solicited under the premise of fighting election fraud.

The new subpoenas encompass a wide variety of those in Mr. Trump's orbit, from low-level aides to his most senior advisers.

The Justice Department has spent more than a year focused on investigating hundreds of rioters who were on the ground at the Capitol on Jan. 6. But this spring, it started issuing grand jury subpoenas to people like Ali Alexander, a prominent organizer with the pro-Trump Stop the Steal group, who helped plan the march to the Capitol after Mr. Trump gave a speech that day at the Ellipse near the White House.

While it remains unclear how many subpoenas had been issued in that early round, the information they sought was broad.

According to one subpoena obtained by The New York Times, they asked for any records or communications from people who organized, spoke at or provided security for Mr. Trump's rally at the Ellipse. They also requested information about any members of the executive and legislative branches who may have taken part in planning or executing the rally, or tried to "obstruct, influence, impede or delay" the certification of the presidential election.

By early summer, the grand jury investigation had taken another turn as several subpoenas were issued to state lawmakers and state Republican officials allied with Mr. Trump who took part in a plan to create fake slates of pro-Trump electors in several key swing states actually won by Mr. Biden.

At least 20 of these subpoenas were sent out and sought information about, and communications with, several lawyers who took part in the fake elector scheme, including Mr. Giuliani and John Eastman.

Around the same time, federal investigators seized Mr. Eastman's cellphone and the phone of another lawyer, Jeffrey Clark, whom Mr. Trump had sought at one point to install as the acting attorney general. Mr. Clark had his own role in the fake elector scheme: In December 2020, he helped draft a letter to Gov. Brian Kemp of Georgia, saying that the state's election results had been marred by fraud and recommending that Mr. Kemp convene a special session of the Georgia Legislature to create a slate of pro-Trump electors.

At least some of the new subpoenas also requested all records that the recipients had turned over to the House Jan. 6 committee, according to a person familiar with the matter.

Michael S. Schmidt and Katie Benner contributed reporting.

Glenn Thrush covers the Department of Justice. He joined The Times in 2017 after working for Politico, Newsday, Bloomberg News, the New York Daily News, the Birmingham Post-Herald and City Limits. @GlennThrush

Maggie Haberman is a White House correspondent. She joined The Times in 2015 as a campaign correspondent and was part of a team that won a Pulitzer Prize in 2018 for reporting on President Trump's advisers and their connections to Russia. @maggieNYT

Adam Goldman reports on the F.B.I. and national security from Washington, D.C., and is a two-time Pulitzer Prize winner. He is the coauthor of "Enemies Within: Inside the NYPD's Secret Spying Unit and bin Laden's Final Plot Against America." @adamgoldmanNYT

Alan Feuer covers extremism and political violence. He joined The Times in 1999. @alanfeuer

A version of this article appears in print on , Section A, Page 17 of the New York edition with the headline: Justice Dept. Issues 40 Subpoenas in Jan. 6 Inquiry

Exhibit G

**The New York Times** | https://www.nytimes.com/2022/09/16/us/politics/trump-lawyers-herschmann.html

## Trump's Team of Lawyers Marked by Infighting and Possible Legal Troubles of Its Own

Several of the former president's lawyers are under scrutiny by federal investigators amid squabbling over competence.

 

**By Maggie Haberman and Glenn Thrush**

Published Sept. 16, 2022   Updated Sept. 19, 2022

> **Sign Up for On Politics, for Times subscribers only.** A Times reader's guide to the political news in Washington and across the nation. Get it in your inbox.

To understand the pressures, feuds and questions about competence within former President Donald J. Trump's legal team as he faces potential prosecution on multiple fronts, consider the experience of Eric Herschmann, a former Trump White House lawyer who has been summoned to testify to a federal grand jury.

For weeks this summer, Mr. Herschmann tried to get specific guidance from Mr. Trump's current lawyers on how to handle questions from prosecutors that raise issues of executive privilege or attorney-client privilege.

After ignoring Mr. Herschmann or giving him what he seemed to consider perplexing answers to the requests for weeks, two of the former president's lawyers, M. Evan Corcoran and John Rowley, offered him only broad instructions in late August. Assert sweeping claims of executive privilege, they advised him, after Mr. Corcoran had suggested that an unspecified "chief judge" would ultimately validate their belief that a president's powers extend far beyond their time in office.

Mr. Herschmann, who served on Mr. Trump's first impeachment defense team but later opposed efforts to reverse the results of the 2020 election, was hardly reassured and sounded confused by the reference to a chief judge.

"I will not rely on your say-so that privileges apply here and be put in the middle of a privilege fight between D.O.J. and President Trump," Mr. Herschmann, a former prosecutor, responded in an email, referring to the Justice Department. The exchange was part of a string of correspondence in which, after having his questions ignored or having the lawyers try to speak directly with him on the phone instead, Mr. Herschmann questioned the competence of the lawyers involved.

The emails were obtained by The New York Times from a person who was not on the thread of correspondence. Mr. Herschmann declined to comment.

Mr. Herschmann's opinion was hardly the only expression of skepticism from current and former allies of Mr. Trump who are now worried about a turnstile roster of lawyers representing a client who often defies advice and inserts political rants into legal filings.

Mr. Trump's legal team just won one round in its battle with the Justice Department over the seizure of documents from his residence and private club in Florida, Mar-a-Lago, and it is not clear whether he will face prosecution from the multiple federal and state investigations swirling around him even as he weighs another run for the presidency.

Mr. Trump has also just brought on a well-regarded lawyer, Christopher M. Kise, the former solicitor general of Florida, to help lead his legal team, after being rejected by a handful of others he had sought out, including former U.S. attorneys with experience in the jurisdictions where the investigations are unfolding.

Mr. Kise agreed to work for the former president for a $3 million fee, an unusually high retainer for Mr. Trump to agree to, according to two people familiar with the figure. Mr. Kise did not respond to an email seeking comment.

But Mr. Trump's legal team has been distinguished in recent months mostly by infighting and the legal problems that some of its members appear to have gotten themselves into in the course of defending him.

In a statement, a spokesman for Mr. Trump, Taylor Budowich, said that "the unprecedented and unnecessary weaponization of law enforcement against the Democrats' most powerful political opponent is a truth that cannot be overshadowed and will continue to be underscored by the vital work being done right now by President Trump and his legal team."

Two members of the Trump legal team working on the documents case, Mr. Corcoran and Christina Bobb, have subjected themselves to scrutiny by federal law enforcement officials over assurances they provided to prosecutors and federal agents in June that the former president had returned all sensitive government documents kept in his residence and subpoenaed by a grand jury, according to people familiar with the situation.

That assertion was proved to be untrue after the search of Mar-a-Lago in August turned up more than 100 additional documents with classification markings.

Investigators are seeking information from Ms. Bobb about why she signed a statement attesting to full compliance with the subpoena, and they have signaled they have not ruled out pursuing a criminal inquiry into the actions of either Ms. Bobb or Mr. Corcoran, according to two people briefed on the matter.

The attestation was drafted by Mr. Corcoran, but Ms. Bobb added language to it to make it less ironclad a declaration before signing it, according to the people. She has retained the longtime criminal defense lawyer John Lauro, who declined to comment on the investigation.

It is unclear whether the authorities have questioned Ms. Bobb yet or whether she has had discussions with Mr. Trump's other lawyers about the degree to which she would remain bound by attorney-client privilege.

Mr. Corcoran and Mr. Rowley did not respond to emails seeking comment.

Mr. Corcoran, a former federal prosecutor and insurance lawyer, represented the former Trump aide Stephen K. Bannon in his recent trial for refusing to comply with a subpoena issued by the House committee investigating the Jan. 6 attack on the Capitol. In that case, Mr. Bannon claimed he believed he had immunity from testimony because of executive privilege; Mr. Trump later said he would not seek to invoke executive privilege for Mr. Bannon.

Mr. Corcoran, the son of a former Republican congressman from Illinois, has told associates that he is the former president's "main" lawyer and has insisted to colleagues that he does not need to retain his own counsel, as Ms. Bobb has.

But several Trump associates have said privately that they believe Mr. Corcoran cannot continue in his role on the documents investigation. That view is shared by some of Mr. Trump's advisers, who have suggested Mr. Corcoran needs to step away, in part because of his own potential legal exposure and in part because he has had little experience with criminal defense work beyond his stint as a federal prosecutor for the U.S. attorney in Washington more than two decades ago.

Mr. Trump has at least 10 lawyers working on the main investigations he faces. Mr. Corcoran, Ms. Bobb and Mr. Kise are focused on the documents case, along with James M. Trusty, a former senior Justice Department official. Three lawyers on the team — Mr. Corcoran, Mr. Rowley and Timothy Parlatore — represent other clients who are witnesses in cases related to Mr. Trump's efforts to stay in power.

To the extent anyone is regarded as a quarterback of the documents and Jan. 6-related legal teams, it is Boris Epshteyn, a former campaign adviser and a graduate of the Georgetown University law school. Some aides tried to block his calls to Mr. Trump in 2020, according to former White House officials, but Mr. Epshteyn now works as an in-house counsel to Mr. Trump and speaks with him several times a day.

Mr. Epshteyn played a key role coordinating efforts by a group of lawyers for and political allies of Mr. Trump immediately after the 2020 election to prevent Joseph R. Biden Jr. from becoming president. Because of that role, he has been asked to testify in the state investigation in Georgia into the efforts to reverse Mr. Biden's victory there.

Mr. Epshteyn's phone was seized by the F.B.I. last week as part of the broad federal criminal inquiry into the attempts to overturn the election results and the Jan. 6 assault on the Capitol. That prompted alarm among some of Mr. Trump's allies and advisers about his remaining in a position of authority on the legal team.

It is not clear how much strategic direction and leadership Mr. Kise may provide. But he is joining a team defined by warring camps and disputes over legal issues.

In his emails to Mr. Corcoran and Mr. Rowley, Mr. Herschmann — a prominent witness for the House select committee on Jan. 6 and what led to it — invoked Mr. Corcoran's defense of Mr. Bannon and argued pointedly that case law about executive privilege did not reflect what Mr. Corcoran believed it did.

Mr. Herschmann made clear in the emails that absent a court order precluding a witness from answering questions on the basis of executive privilege, which he had repeatedly implored them to seek, he would be forced to testify.

"I certainly am not relying on any legal analysis from either of you or Boris who — to be clear — I think is an idiot," Mr. Herschmann wrote in a different email. "When I questioned Boris's legal experience to work on challenging a presidential election since he appeared to have none — challenges that resulted in multiple court failures — he boasted that he was 'just having fun,' while also taking selfies and posting pictures online of his escapades."

Mr. Corcoran at one point sought to get on the phone with Mr. Herschmann to discuss his testimony, instead of simply sending the written directions, which alarmed Mr. Herschmann, given that Mr. Herschmann was a witness, the emails show.

In language that mirrored the federal statute against witness tampering, Mr. Herschmann told Mr. Corcoran that Mr. Epshteyn, himself under subpoena in Georgia, "should not in any way be involved in trying to influence, delay or prevent my testimony."

"He is not in a position or qualified to opine on any of these issues," Mr. Herschmann said.

Mr. Epshteyn declined to respond to a request for comment.

Nearly four weeks after Mr. Herschmann first asked for an instruction letter and for Mr. Trump's lawyers to seek a court order invoking a privilege claim, the emails show that he received notification from the lawyers — in the early morning hours of the day he was scheduled to testify — that they had finally done as he asked.

His testimony was postponed.

Michael S. Schmidt contributed reporting.

Kitty Bennett contributed research.

# Exhibit H

**The New York Times** | https://www.nytimes.com/2022/09/23/us/trump-privilege-investigation.html

# Trump Lawyers Push to Limit Aides' Testimony in Jan. 6 Inquiry

The former president's legal team is seeking to invoke attorney-client and executive privilege over grand jury testimony after waves of subpoenas went out to witnesses.

**By Alan Feuer and Maggie Haberman**

Sept. 23, 2022

Lawyers for former President Donald J. Trump are engaged in a behind-the-scenes legal struggle to limit the scope of a federal grand jury investigation into the role he played in seeking to overturn the 2020 election, according to people familiar with the matter.

The closed-door battle, unfolding in Federal District Court in Washington, has centered on how far Mr. Trump can go in asserting attorney-client and executive privilege as a means of keeping witnesses close to him from answering potentially damaging questions in their appearances before the grand jury, the people said.

The issue is important because it will determine how much evidence prosecutors can get from an inner circle of some of Mr. Trump's most trusted former lawyers and advisers. The outcome will help to shape the contours of the information that the Justice Department will be able to gather, as it looks into Mr. Trump's involvement in the chaotic events after the election that culminated in the attack on the Capitol on Jan. 6, 2021.

That process continues even as the Justice Department also pursues a separate criminal investigation into Mr. Trump's handling of government documents that he took with him when he left office, including hundreds marked as classified.

A federal appeals court this week blocked a lower court's order that had stalled a key portion of the documents investigation. And on Friday, the Office of the Director of National Intelligence said that the intelligence agencies had resumed a risk assessment of the classified material seized in the search last month of Mar-a-Lago, Mr. Trump's residence and private club in Florida. The work involves assessing the potential national security risk that would result from disclosure of the documents, the office announced.

The court appearances by the lawyers in the battle over how expansively Mr. Trump would be able to claim privilege in the Jan. 6 investigation, as first reported by CNN, are proceeding under seal, like all matters concerning grand juries. As a general rule, issues that touch on federal grand juries in Washington are overseen by the district's chief judge, Beryl A. Howell.

The court fight comes as an increasing number of high-ranking officials in Mr. Trump's administration have received grand jury subpoenas as part of the Justice Department's inquiry into a wide array of efforts to overturn the election, including a plan to create fake slates of pro-Trump electors in key swing states that were won by Joseph R. Biden Jr.

This month, more than 40 subpoenas were issued to a large group of former Trump aides — among them, Mark Meadows, Mr. Trump's final chief of staff; Dan Scavino, his onetime deputy chief of staff for communications; and Stephen Miller, Mr. Trump's top speechwriter and a senior policy adviser.

The wide-ranging subpoenas sought information on a host of subjects that included the fake elector plan, attempts to paint the election as having been marred by fraud and the inner workings of Mr. Trump's main postelection fund-raising vehicle, Save America PAC.

The recent flurry of subpoenas came only days after Pat A. Cipollone, the chief lawyer in Mr. Trump's White House, and his former deputy, Patrick Philbin, testified before the grand jury. In July, two top aides to former Vice President Mike Pence — Marc Short, Mr. Pence's onetime chief of staff, and Greg Jacob, his former chief lawyer — also appeared in front of the grand jury.



Pat A. Cipollone, the chief lawyer in the Trump White House, has testified before the
grand jury.  Pete Marovich for The New York Times

While the legal wrangling in front of Judge Howell is meant to be secret, three of Mr. Trump's lawyers — M. Evan Corcoran, John Rowley and Timothy Parlatore — were seen on Thursday leaving the federal courthouse in Washington. Their appearance there was related, at least in part, to discussions about whether Mr. Trump's assertions of privilege could limit the testimony of Mr. Short and Mr. Jacob, according to a person familiar with the matter.

Mr. Parlatore declined to comment. Neither Mr. Corcoran nor Mr. Rowley returned messages seeking comment.

Last week, The New York Times reported that Eric Herschmann, another lawyer who had worked in Mr. Trump's White House, spent weeks this summer trying to get specific guidance from Mr. Corcoran, Mr. Rowley and Mr. Parlatore on how to handle questions that might raise privilege issues since he, too, had been summoned before the grand jury.

In emails reviewed by The Times, Mr. Herschmann complained that a letter from Mr. Trump directing him to assert privilege in front of the grand jury — as other witnesses had — was not enough to allow him to avoid answering questions.

"I will not rely on your say-so that privileges apply here and be put in the middle of a privilege fight between D.O.J. and President Trump," Mr. Herschmann, a former prosecutor, wrote in one of the emails, referring to the Justice Department.

Mr. Herschmann repeatedly implored Mr. Corcoran and Mr. Rowley to go to court seeking an order from a judge "precluding me from answering questions based on privilege assertions by President Trump," according to the emails. They ignored his request for many days, before ultimately filing a motion under seal on Sept. 1, just hours before Mr. Herschmann was set to testify, the emails showed. Mr. Herschmann's grand jury appearance was postponed.

Attorney-client privilege is not an ironclad protection for lawyers and can be swept aside in cases where crimes have been committed. In July, for instance, a federal judge in California denied the attorney-client privilege claims of the lawyer John Eastman after finding that Mr. Eastman and Mr. Trump had likely conspired together to obstruct the certification of the presidential election on Jan. 6. Under the judge's decision, Mr. Eastman was forced to give the House select committee investigating Jan. 6 a trove of his emails.

In a somewhat similar fashion, Mr. Trump asserted executive privilege over a batch of his White House records that the House committee wanted to examine as part of its inquiry — even though Mr. Biden, as the current president, had waived executive privilege over the documents.

In January, after lower courts had weighed in, the Supreme Court effectively rejected Mr. Trump's claims and allowed the committee to use records. But an opinion by Justice Brett M. Kavanaugh that accompanied the decision suggested that Mr. Trump should have some residual power to assert executive privilege.

"A former president must be able to successfully invoke the presidential communications privilege for communications that occurred during his presidency, even if the current president does not support the privilege claim," Justice Kavanaugh wrote. "Concluding otherwise would eviscerate the executive privilege for presidential communications."

Julian E. Barnes contributed reporting.

# Exhibit I

 politics

AudioLive TV

## Exclusive: Trump's secret court fight to stop grand jury from getting information from his inner circle

By Evan Perez, Katelyn Polantz and Zachary Cohen, CNN

Updated 8:15 AM EDT, Sat September 24, 2022



☐ Video Ad Feedback

Attorney says slow build up of Jan. 6 investigation is what Garland's known for

02:11 • Source: CNN

**See More Videos**

---

**(CNN) —** Former President Donald Trump's attorneys are fighting a secret court battle to block a federal grand jury from gathering information from an expanding circle of close Trump aides about his efforts to overturn the 2020 election, people briefed on the matter told CNN.

The high-stakes legal dispute – which included the appearance of three attorneys representing Trump at the Washington, DC, federal courthouse on Thursday afternoon – is the most aggressive step taken by the former President to assert executive and attorney-client privileges in order to prevent some witnesses from sharing information in the criminal investigation events surrounding January 6, 2021.

The court fight over privilege, which has not been previously reported and is under seal, is a turning point for Trump's post-presidency legal woes.

How the fight is resolved could determine whether prosecutors can tear down the firewall Trump has tried to keep around his conversations in the West Wing and with attorneys he spoke to as he sought to overturn the 2020 election and they worked to help him hold onto the presidency.

This dispute came to light as former Trump White House adviser and lawyer Eric Herschmann received a grand jury subpoena seeking testimony, the people briefed said.



**RELATED ARTICLE**
Trump allies launch new super PAC to bolster GOP candidates in midterms as former President eyes 2024 campaign

---

Other former senior Trump White House officials, including former White House counsel Pat Cipollone and his deputy Patrick Philbin, appeared before the grand jury in recent weeks, after negotiating specific subjects they would decline to answer question about, because of Trump's privilege claims.

Herschmann himself is not in court fighting the subpoena. Instead, Trump's lawyers are asking a judge to recognize the former President's privilege claims and the right to confidentiality around his dealings. Herschmann's grand jury testimony has been postponed.

It's still unknown if prosecutors want to use the information for possible cases against Trump or others.

Trump's lawyers have expected the Justice Department to eventually seek a judge's order to compel additional testimony from White House witnesses, CNN has previously reported.

The Justice Department didn't respond to a request for comment.

## Fight playing out under seal

Under grand jury secrecy rules, the legal dispute is under seal, with no public documents to show the state of play.

The Justice Department has been girding for a legal challenge along these lines for months, CNN previously reported.

In addition to Cipollone and Philbin, former vice presidential aides Greg Jacob and Marc Short have appeared before the grand jury in the DC courthouse and declined to answer some questions because of Trump's executive privilege claims, CNN previously reported.



**RELATED ARTICLE**
Trump's strategy in the classified documents case is quickly crumbling

On Thursday afternoon, Evan Corcoran, Tim Parlatore and John Rowley, who work together representing Trump in the January 6 probe, exited the courthouse accompanied by a law clerk.

Parlatore told reporters he was there "representing a client" but would provide no further details. The other lawyers declined to comment.

The Trump legal team's push to broadly assert privilege has been subject of disagreement among its lawyers over legal strategy, people briefed on the matter said.

Herschmann received a grand jury subpoena for testimony and documents related to January 6 weeks ago. But he was irked before his court date by what he saw as vague guidance from Trump lawyers not to share information, people briefed on the matter say.

Herschmann pushed Trump lawyers to provide him with more detailed instructions for which topics to assert privilege over, according to emails reviewed by CNN and first reported by The New York Times.

"A letter directive from President Trump without a court order would not be sufficient. I don't understand your statement that the chief judge will decide the issue," Herschmann wrote. He then raised concerns about DOJ seeking to compel his testimony if he refused to testify to certain questions.

Herschmann previously testified to the House committee about what he saw at the White House around January 6.

The outspoken lawyer expressed concerns that the Trump team's approach potentially put him at risk for grand jury contempt, according to people briefed on the matter. He pushed back when Trump's lawyers sent him a letter with instructions that he cite executive or attorney-client privileges to the grand jury.

Other former Trump aides have expressed similar frustration at the vagueness of the Trump privilege claim, people briefed on the matter tell CNN.

Attorney-client privilege claims can be overcome for a number of reasons, including if any information is shared outside of the attorney-client pipeline and if the communication relates to possible wrongdoing. In the January 6 situation, a federal judge in California has already found email exchanges to and from John Eastman, Trump's election attorney, wouldn't be covered by this confidentiality, providing the records to House investigators and allowing the Justice Department to access those and other similar exchanges.



**RELATED ARTICLE**
Mar-a-Lago special master orders Trump team to back up any claims of FBI 'planting' evidence

Executive privilege is a tougher pursuit for investigators, though not impossible to overcome. The Justice Department gained access to Nixon's Watergate tapes for a federal grand jury in the 1970s because of a Supreme Court ruling that the criminal investigation needed the materials. But courts haven't hammered out exactly where the lines would be drawn in this investigation, or for a former President who may try to keep secret advice he was given while leading the

drawn in this investigation, or for a former President who may try to keep secret advice he was given while leading the country.

The dispute is separate from privilege protections Trump has tried to claim in the separate investigation of handling of federal records and national security information after his presidency. That investigation prompted the FBI to seize classified documents from Trump's Mar-a-Lago resort, and a judge acting as a special master is now working through the more than 10,000 non-classified records to determine if Trump can block them from investigators.

CNN's Jeremy Herb and Andrew Millman contributed to this report.

**Paid Links**

Search CNN...

Log In

Live TV

Audio

World

US Politics

Business

Health

Exhibit J

**The New York Times** | https://www.nytimes.com/2022/09/30/us/politics/trump-executive-privilege.html

# Jan. 6 and Mar-a-Lago Inquiries Converge in Fights Over Executive Privilege

In both cases, former President Donald J. Trump is claiming a novel power to keep White House information from his time in office secret from the Justice Department.

 

**By Charlie Savage and Glenn Thrush**

Sept. 30, 2022

> **Sign Up for On Politics, for Times subscribers only.**  A Times reader's guide to the political news in Washington and across the nation. Get it in your inbox.

WASHINGTON — Two high-profile criminal investigations involving Donald J. Trump are converging on a single, highly consequential question: How much residual executive privilege can a former president invoke after leaving office?

As the Justice Department investigates both Mr. Trump's attempt to overturn the 2020 election and his retention of sensitive documents at his Florida residence, his legal team has repeatedly claimed that he has retained power to keep information secret, allowing him to block prosecutors from obtaining evidence about his confidential Oval Office communications.

President Biden is not backing Mr. Trump's attempt to use that power, and many legal scholars and the Justice Department have argued that he is stretching the narrow executive privilege rights the Supreme Court has said former presidents may invoke. But there are few definitive legal guideposts in this area, and the fights could have significant ramifications.

In the short term, the disputes could determine whether Mr. Trump is able to use the slow pace of litigation to delay or impede the inquiries. They could also establish new precedents clarifying executive secrecy powers in ways that will shape unforeseen clashes involving future presidents and ex-presidents.

"This is tricky stuff," said Mark J. Rozell, a George Mason University professor and author of "Executive Privilege: Presidential Power, Secrecy and Accountability." "That gets to the point where the Trump era changed things and raised these kinds of questions that before were unthinkable to us."

Executive privilege can protect the confidentiality of internal executive branch information from disclosure. The Supreme Court first recognized it as a presidential power implied by the Constitution during the Watergate era, and only a handful of opinions have sketched out its parameters over the decades, in part because current and former presidents typically work out such issues in private.

The issue under debate in the two Trump cases, presidential communications privilege, can protect a president's discussions with White House aides — or their interactions with each other — that relate to presidential decision-making.



Mr. Trump's lawyers have instructed several former aides not to answer questions in the Jan. 6 investigation, based on a sweeping conception of executive privilege.  Pete Marovich for The New York Times

Such communications may be vital evidence in determining Mr. Trump's actions in the period between the 2020 election and the attack on the Capitol on Jan. 6, 2021.

In the Jan. 6 investigation, the Justice Department has obtained grand jury subpoenas for several former aides to Mr. Trump seeking testimony about his conversations. Mr. Trump's lawyers have instructed them not to answer questions, based on a broad conception of his residual powers of executive privilege, even though Mr. Biden has rejected the idea as not in the best interests of the United States.

A dispute over whether those witnesses may lawfully decline to answer certain questions is now playing out before Beryl Howell, the chief judge of the Federal District Court for the District of Columbia, behind closed doors, according to people familiar with the matter.

In the documents investigation, Mr. Trump's lawyers have convinced a judge he appointed in November 2020, Aileen M. Cannon of the Southern District of Florida, to name a special master to oversee the vetting of some 11,000 documents and records the F.B.I. seized from his Florida residence, Mar-a-Lago, in August.

Over the Justice Department's objections, Judge Cannon ruled that Mr. Trump can make the case to the special master — and, ultimately, to her — that some of the documents should be withheld from investigators under executive privilege. She rejected the department's argument that Mr. Trump was entirely foreclosed from raising the privilege in these circumstances.

But Judge Cannon has also hedged, writing that Mr. Trump should have the ability to invoke the privilege "as an initial matter" but also suggesting that any assertion in this context might ultimately fail. For its part, the Trump legal team has shied away from explaining why material covered by executive privilege would be off limits to investigators with the Justice Department, a component of the executive branch.

"Trump's team has not been entirely clear in asserting their executive privilege claims in their early briefs," said Michael Stern, a former counsel with the House Permanent Select Committee on Intelligence who writes on issues involving investigations, national security and the law. "They have laid out a broad argument, but it remains to be seen how, exactly, they are going to make their case as these issues move up to appellate courts."

The special master Judge Cannon appointed, Judge Raymond J. Dearie, had instructed Mr. Trump's lawyers to go through the seized records and distinguish between those they think are merely shielded from disclosure to people outside the executive branch, which is not unusual, and those they think the executive branch itself supposedly cannot review, a much more radical proposition. He also wanted them to explain why for each document.

Mr. Trump's legal team chafed against articulating any such distinction. And on Thursday, Judge Cannon relieved his lawyers from fulfilling Judge Dearie's request, saying in an order that they need only categorize something as subject to executive privilege in general.

On Friday night, the Justice Department asked a federal appeals court in Atlanta to expedite its request that the court overrule Judge Cannon and shut down the special master process or at least remove consideration of executive privilege claims from it.

A panel on the court had already granted the department's request to exempt about 100 documents marked classified from the review, while criticizing Judge Cannon's legal reasoning in appointing a special master. Citing that ruling, the department asked the court to hasten the remaining proceedings in the appeal, wrapping them up as early as mid-November.

"If this court agrees that the district court lacked jurisdiction, further proceedings before the special master and district court would end," the Justice Department wrote. "Alternatively, if this court upholds the district court's exercise of jurisdiction but concludes that plaintiff cannot assert executive privilege against the executive branch in these circumstances, as the government maintains, such a ruling would substantially narrow the special master proceedings."

No president has ever successfully invoked executive privilege to hide information from members of the executive branch, like Justice Department investigators, as opposed to outsiders, like members of Congress. And no former president has ever successfully invoked executive privilege when the current president opposes it.

But such questions rarely arise, and the handful of cases on the topic have left many questions unresolved. Few of those rulings define the limits of the privilege in the context of a criminal investigation, and even fewer address the issue of a former president's powers.

Mr. Trump's power play also arguably challenges a philosophical tenet of the conservative legal movement that worked closely with his administration to appoint jurists associated with the Federalist Society, including Judge Cannon, to the bench.

Many connected to the conservative legal movement embrace an ideology, known as the unitary executive theory, that the Constitution vests all federal executive power in a single person: the president. Allowing a private citizen who used to be in the White House to successfully invoke executive privilege against the president would fracture that control.

"There is a decent argument that it does" infringe upon the current president's rightful powers, William P. Barr, the former attorney general under Mr. Trump, said in a text.



William P. Barr, Mr. Trump's former attorney general, has criticized the former
president's request for a special master in the documents case.  Anna Moneymaker for The
New York Times

(Mr. Barr used his authority to shield Mr. Trump in office, but after the 2020 election, he refused to back Mr. Trump's false claims of a stolen election. The two have since traded criticisms, with Mr. Barr disparaging Mr. Trump's request for a special master.)

From the other end of the political spectrum, Bob Bauer, a former Obama White House counsel who is now Mr. Biden's personal lawyer, also dismissed Mr. Trump's privilege argument.

"Trump's legal team is facing very long odds, to say the least," Mr. Bauer said. "But they may see strategic value in slowing things down by litigating every last strained argument. So it is more ploy than law."

The Supreme Court first said that the Constitution implicitly gives presidents some power to keep their confidential communications secret in President Richard M. Nixon's legal fights during and after the Watergate scandal.

The purpose of executive privilege, the justices have said, is to benefit the country as a whole — not to benefit presidents as individuals. The idea is that presidents will make better decisions if they receive full and candid advice, with expectations of confidentiality keeping their advisers from feeling chilled from expressing any potentially unpopular views.

But the justices also made clear that this is not an absolute power: A "demonstrated, specific need" for information can overcome the presidency's "generalized" need for confidentiality, as the Supreme Court wrote in 1974.

In several cases, the courts have held that executive privilege can be overridden if evidence is needed for a criminal proceeding. They include a 1974 Supreme Court ruling involving the Watergate prosecutor's subpoena for tapes of Nixon's Oval Office discussions, and a 1997 appeals court ruling involving a grand jury subpoena for Clinton White House notes about an official accused of improperly taking gifts.

Both cases involved an assertion of executive privilege by a sitting president. The present situation — in which Mr. Trump is no longer the president, and President Biden does not support his invocation of executive privilege — adds another complexity.

One rare guidepost also comes from the post-Watergate era. After Congress enacted a law making clear that Nixon White House records belong to the public, Nixon — now out of office — challenged the law as unconstitutional. He said it violated executive privilege to allow executive branch archivists to see his materials.



Former President Richard M. Nixon tested the limits of executive privilege, attempting to invoke the power after his presidency without the blessings of Presidents Gerald R. Ford and Jimmy Carter.  Associated Press

Presidents Gerald R. Ford and Jimmy Carter disagreed. And in 1977, the Supreme Court ruled that while a former president retains power to assert executive privilege, the views of the incumbent office holder should be afforded greater weight. The majority sided against Nixon and upheld the law on its face, but left the door open to later challenges about specific documents. He instead dropped the matter.

A more recent precedent arose when the House committee investigating the Jan. 6 riot subpoenaed the National Archives for Trump White House records. Mr. Trump invoked the privilege, but Mr. Biden opposed using it and said the executive branch information should be disclosed.

The Supreme Court refused to block the release, with only Justice Clarence Thomas registering a dissent. But the majority left unaddressed whether there were circumstances in which a former president's claim of privilege could override the incumbent's. Justice Brett M. Kavanaugh, in a concurring opinion, insisted that there were.

"A former president must be able to successfully invoke the presidential communications privilege for communications that occurred during his presidency, even if the current president does not support the privilege claim," he wrote. "Concluding otherwise would eviscerate the executive privilege for presidential communications."

Alan Feuer contributed reporting.

Exhibit K

## The Washington Post

*Democracy Dies in Darkness*

**LEGAL ISSUES**

# Judge bucks Trump, orders Pence aide to testify to Jan. 6 grand jury

The appeals court refused to postpone testimony Thursday by Marc Short, dealing a blow to the former president's claim of executive privilege and potentially clearing the way for other former top Trump aides to testify

By Spencer S. Hsu, Josh Dawsey and Jacqueline Alemany

October 14, 2022 at 12:30 p.m. EDT

A former top aide to Vice President Mike Pence returned before a grand jury Thursday to testify in a criminal probe of efforts to overturn the 2020 election after federal courts overruled President Donald Trump's objections to the testimony, according to people familiar with the matter.

In a sealed decision that could clear the way for other top Trump White House officials to answer questions before a grand jury, Chief U.S. District Judge Beryl A. Howell ruled that former Pence chief of staff Marc Short probably possessed information important to the Justice Department's criminal investigation of the Jan. 6, 2021, attack on the Capitol that was not available from other sources, one of those people said.

Trump appealed, but the U.S. Court of Appeals for the District of Columbia Circuit refused to postpone Short's appearance while the litigation continues, the people said, signaling that attempts by Trump to invoke executive privilege to preserve the confidentiality of presidential decision-making were not likely to prevail.

The people spoke on the condition of anonymity to discuss an ongoing investigation.

Short on Friday declined to comment about his court appearance, which stretched through much of the day. His attorney, Emmet Flood; an attorney for Trump, John P. Rowley III; and a Justice Department spokesman declined to comment.

Grand jury matters are typically secret, but The Washington Post has reported that prosecutors are working with grand jurors and looking extensively at the actions of Trump and his advisers in the period between the November 2020 election and Jan. 6, 2021. Short's case came to light on Sept. 22 after Trump attorneys M. Evan Corcoran, Timothy C. Parlatore and Rowley were seen at federal court in Washington when there were no publicly scheduled matters, along with a lead Jan. 6 federal prosecutor, Thomas Windom.

According to people familiar with the matter, Short had appeared before a grand jury in downtown Washington in July, but declined to answer certain questions after Flood argued the communications of top White House advisers are protected — and presented written documentation from Trump's lawyers that they were asserting executive privilege.

The Justice Department asked the court to intervene, urging Howell to override Trump's claim and to compel Short to answer questions about his communications with Trump, one person said. After arguments Sept. 22, Howell granted the government's motion, the people said, but because the investigation and an appeal are ongoing, it is unclear if or when a redacted opinion will become public.

Short and Windom were spotted at court again Thursday, as was former Trump national security and defense aide Kash Patel.

The executive privilege battle caps the latest high-stakes confrontation between the Justice Department and Trump. Prosecutors have asked numerous witnesses about their conversations with Trump and other associates who sought to substitute Trump allies for certified electors from some states Joe Biden won, and to pressure Pence to overturn the results of the election, people familiar with the matter have said.

Those inquiries are separate from the investigation into classified documents recovered from Trump's Mar-a-Lago home, which has triggered separate legal fights over issues of executive and attorney-client privilege.

On Thursday, the House Jan. 6 select committee voted unanimously to subpoena Trump himself to testify before legislators, potentially triggering another clash.

The fight over Short's testimony also throws another twist into the complicated relationship between Trump and Pence. On Jan. 6, Trump encouraged an angry mob chanting "Hang Mike Pence" to go to the Capitol and later accused his vice president of lacking "courage" to overturn the results.

Short and Pence lawyer Greg Jacob may have key insights on that effort. Both were with Pence on Jan. 6 at the Capitol. With Pence's approval, both testified to the House select committee investigating the events, although the former vice president declined to do so himself. Jacob also told the committee that two days before the riot, private Trump attorney John Eastman conceded that the plot to have Pence help overturn the election was illegal.

Other senior Trump White House officials could also be affected by the outcome of the court ruling involving Short. Former Trump White House counsel Pat Cipollone and his deputy, Pat Philbin, appeared before the Jan. 6 grand jury in early September, spending about four hours behind closed doors with grand jurors. It is not known whether they declined to answer any questions citing a Trump invocation of privilege, or whether prosecutors have objected.

Cipollone, the top White House lawyer at the end of the Trump administration, has emerged in several public accounts as a key witness to and critic of conversations held by Trump with others promoting plans to upend election results.

In videotaped testimony played at televised House hearings this summer, Cipollone said he vigorously resisted such efforts, and that he and former Trump attorney general William P. Barr did not believe there was sufficient fraud to have affected the outcome of the presidential election in any state.