## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE GRAND JURY SUBPOENAS

███████████████████

Case No. 22-gj-25 (BAH)

Chief Judge Beryl A. Howell

**UNDER SEAL**

**EX PARTE TO GOVERNMENT ONLY**

## MEMORANDUM OPINION

In June 2022, a grand jury sitting in this District and investigating conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant temporary halt of the constitutionally mandated congressional certification of the Electoral College vote for the 2020 presidential election, issued subpoenas for testimony to ████████████████████ ████████████████████████████ and ███████████████████████ ████████████. In ███████ both witnesses appeared separately before the grand jury and declined to respond to certain questions by invoking executive privilege ████████████ ████████████████ pursuant to directions given to each witness by former president Donald J. Trump. The former president claims that the presidential communications privilege, one species of executive privilege, bars these two witnesses from testifying about communications with him before the grand jury, ████████████████████████████ ██████ The government now moves to compel withheld testimony from these two witnesses because the grand jury's need for the important information overcomes the former president's privilege claims.

For the reasons explained below, the government's motion is granted.

## I.    BACKGROUND

The grand jury's need for testimony from ███████████ stems directly from these

witnesses' knowledge of events leading up to the certification of Electoral College votes by a

Joint Session of Congress on January 6, 2021. ████████████████████████████████

████████████████████████████████ Those events have been diligently recounted

by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir. 2021), and described

by witnesses under oath at public hearings before the U.S. House of Representatives Select

Committee to Investigate the January 6th Attack on the United States Capitol ("House Select

Committee" or "HSC"), as summarized in part below.

### A.    2020 Presidential Election and Other Events Leading to January 6, 2021, Joint Session of Congress

In the November 2020 presidential election, 81,268,924 Americans, amounting to

51.31% of the votes cast, elected Joseph Biden as president, compared to 74,216,154 votes, or

46.86%, for Donald J. Trump. *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL

GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-

content/documents/2020presgeresults.pdf. Nonetheless, the former president "refused to

concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud

and irregularities." *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on

2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-

span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Sept.

27, 2022)). The former president and his allies filed numerous legal challenges to election

results across the country, none of which proved successful. *Id.* In a last-ditch effort, individuals

associated with the former president, the White House, and the former president's election

campaign team attempted to influence the Electoral College vote scheduled for December 14,

2020, by urging the former president's supporters in closely contested states that candidate Biden

2

won to self-declare as duly appointed and qualified electors and cast votes for the former

president on December 14, 2020, on fraudulent elector certificates. *See Hr'g on Jan. 6th*

*Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States*

*Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 00:54:46–1:04:32,

available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-

attack-us-capitol (last accessed on Sept. 27, 2022) (describing the fake elector scheme).[1]

 As constitutionally required by the Twelfth Amendment, the Electoral College votes cast

on December 14, 2020, were then certified by a Joint Session of Congress convened on January

6, 2021, over which the former vice president was to preside, who was to call for objections to

the vote and, after all objections were resolved by the two congressional houses and the count

was complete, announce the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3

(describing the congressional meeting of electors and vote certification); 3 U.S.C. § 15 (process

---

[1]



describing the counting of electoral votes in Congress). "In anticipation of that event, President Trump had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that he claimed would be "'wild.'" *Thompson*, 20 F.4th at 17 (quoting Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).

"Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse" and, during his "more than hour-long speech," repeated his claims of a "rigged" election. *Thompson*, 20 F.4th at 17–18. During that speech, the former president

specifically urged the former vice president "to 'do the right thing' by rejecting various States'
electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18 (quoting
Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–
3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-
1/rally-electoral-college-vote-certification (last accessed Sept. 27, 2022) ("January 6th Rally
Speech")). The former president also encouraged his supporters to go to the Capitol to "demand
that Congress do the right thing" by refusing to certify the votes and to "fight like hell" or else
"you're not going to have a country anymore." *Id.* (citing January 6th Rally Speech at 3:47:20–
3:47:42, 4:41:17–4:41:33). At that rally, the former president's private attorney Rudolph
Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral
vote certification under the Electoral College Act and called for "trial by combat." John Eastman
and Rudolph Giuliani, January 6th Rally Speech at 2:22:09. Eastman added that "all we are
demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures of
the state look into this so we get to the bottom of it and the American people know whether we
have control of the direction of our government or not." *Id.* at 2:26:54–2:27:12.

As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently
broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed
Congress's vote certification. *Thompson*, 20 F.4th at 18–19. Due to the catastrophic security
breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from
the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the
Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* at 18. The former
president did not request support for law enforcement members, many of whom were assigned to
protect the former vice president. *Hr'g on Jan. 6th Investigation Before the H. Select Comm. to
Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC

6

Hr'g Tr. (July 21, 2022)") at 00:34:48–00:36:02, available at https://www.c-span.org/video/?521771-1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Sept. 27, 2022).



        As the events unfolded at the U.S. Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol.  For example, on January 6, 2021, the Federal Bureau of Investigation ("FBI") made an emergency request to a social media platform for non-content user identification information of users who broadcasted live video or uploaded videos from physically within the Capitol building when it was occupied by unauthorized persons, to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry, disorderly conduct, and other offenses on Capitol grounds)).  *See United States v. Bledsoe*, No. 21-204 (BAH), 2022 U.S. Dist. LEXIS 150326, at \*9, \*12 (D.D.C. Aug. 22, 2022) (denying motion to suppress fruits of FBI's

emergency request, on January 6, 2021, to Facebook for non-content user-generated location information ("UGLI") derived from user-generated content posted from inside the Capitol building during the attack). Since then, hundreds of individuals have been investigated, charged, and convicted in this District for their criminal conduct in planning for and participating in the breach of the Capitol that resulted in disruption of the official proceeding of Congress to certify the results of the 2020 presidential election.

### B.    Instant Grand Jury Investigation

### C.    Procedural History

In connection with the instant grand jury investigation, the government planned to serve subpoenas to                                                                    to require testimony.



███████████████████████████████████ ██ ████

█ Following ████████████████████████████████ discussions with counsel for ████████, the government learned that the former president's counsel had attempted to exclude certain information from the witnesses' Committee interviews on grounds of executive privilege. ██ ██ Anticipating that the former president would assert the privilege again in reference to any grand jury testimony of ████████ and that such invocation of the privilege would necessitate discussions between counsel for the former president and of the witnesses, the government sought, with the consent of counsel for ████████, ██ ██ an order from this Court "permitting the Government to discuss the grand jury subpoenas for ████ ████ with counsel for the incumbent and former presidents[,]" which included "communicating with the Office of White House Counsel (for the incumbent President) and ████████ (for the former president)," ██ ██. Such discussions would enable the government to "ascertain whether any potential privilege holder – including the incumbent and former Presidents – intend to instruct the witnesses not to testify regarding communications covered by executive privilege[,]" ██ ██, and thereby remove "the onus of these consultations" from the witnesses, ██ ██. The government's motion to disclose the relevant grand jury materials as requested was granted on June 10, 2022. ████████

████████

    On June 15, 2022, the government served on ████████ grand jury subpoenas to testify, ████████████████████████████████████, along with cover letters ████████████████████████████, ████████████████████████████. The government subsequently forwarded those cover letters to the Office of White House Counsel, querying whether President Biden would assert executive privilege to bar ████████ testimonies, ████████

█ ████████████████████████████████████████████████████████

████████████████, to which the White House Counsel's Office responded in less than one

week that President Biden "does not intend to assert executive privilege," ████████████

████████████████████████████████████████████████████████.

The government was permitted to disclose the White House Counsel's Office letter to ████████

████.

████████████████████████████████████████████

      The government made the same request communicated to President Biden to the former

president's counsel, sending a letter on ████████████, the same day the letter was sent to the

White House Counsel, with copies of the ████████████ cover letters. ████████████████

████████████████████████. Several weeks later, the former president's counsel sent

directly to counsel for ████████████, on ████████████████████ respectively—█

████████████████████████████████████████—letters

instructing that they were "to the fullest extent permitted by law, . . . not to provide testimony

about, or reveal in any forum, privileged communications and correspondence." ████████████

████ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████. The letters from the former president's counsel further explained—

without using the term "executive privilege"—that "there is an expectation of confidentiality in a

President's conversations and correspondence with those who advise and assist him," which

"confidentiality is protected under the United States Constitution" and "[a]ll such presidential

communications are presumptively privileged." ████████. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

10

██████ ████

██████████ testified before the grand jury on ██████████, and ██████████, ██████████, and each witness notably declined to answer certain questions, citing executive privilege ████████████████████████████████.[2]

On ██████████, the government moved to compel ██████████ to testify ████████ ██████████, listing as respondents the two grand jury witnesses as well as the former president. ████████████████████████████

████████████████████████████

████████████████████████

████████████████████████████

████████████████████████

████████████████████████████

████████████████████████

██

Simultaneously with the filing of this motion ████████████████ ██████████, the government requested permission for limited disclosure of the sealed motion to the witnesses and the former president subject to certain protections. The Court granted that request, citing Local Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which together prohibit the public release of proceedings on a motion connected with a grand jury subpoena or matter before the grand jury unless ordered by the Court to "advance the important public and private interests served by the grand jury secrecy requirement." ████

████████████████████████

---

[2] ████████████████████████████████

[3] ████████████████████

▉▉▉▉▉▉▉▉▉▉▉▉▉ Pursuant to the Protective Order, the government was

directed to serve, through counsel, the two grand jury witnesses and the former president with

copies of the Protective Order, the government's motion to compel with accompanying proposed

order, and the government's motion for the protective order. ▉▉▉ The Protective Order

prohibited the witnesses and former president from disclosing any information pertaining to

these proceedings to the public and restricted access to the proceeding's materials to attorneys of

record, their clients, and those individuals necessary to litigate the issues presented. ▉▉▉

Finally, the Protective Order directed conferral among the interested parties on a briefing

schedule and a date for submission of any agreed-upon schedule to the Court. ▉▉▉

In the interest of fairness and to enable the most fulsome review, an extended briefing

schedule, as agreed to by the parties, was ordered on the motion to compel beyond the time

requirements of Local Criminal Rule 47(b), to give the former president additional time to

respond to the government's motion—resulting in twenty-five days to submit an opposition—

and the government seven additional days—fourteen days total—to submit a reply. ▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉. After all briefing was submitted, ▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉, to give the parties another opportunity to explain their positions. The

government's motion is now ripe for review.

## II.    DISCUSSION

The executive privilege doctrine is "used to refer to a wide variety of evidentiary and

substantive privileges that courts accord the executive branch." *In re Sealed Case*, 121 F.3d 729,

735 n.2 (D.C. Cir. 1997). Thus, at the outset, the specific species of this privilege at issue here is

described before turning to the separate issues of whether the former president's invocation of

presidential communications privilege operates, in this grand jury context, to bar the compelled

testimony of ▚▚▚▚▚ , ▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚

▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚ . ▚▚▚▚▚▚▚▚▚▚▚▚▚▚▚

Neither privilege invoked by the former president blocks the testimony of the witnesses on matters highly relevant and important to the grand jury investigation. Finally, the procedural steps urged by the former president that would delay resolution of the government's motion to compel or the witnesses' testimony before the grand jury, or both, are discussed and easily dispatched.

## A. Executive Privilege Generally

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id.* § 3, to name a few. Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff. As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d at 736.

The privilege granted to the executive branch has two distinct species, each derived from the same recognized need to protect executive branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege. *See id.* at 745. The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing

*In re Sealed Case*, 121 F.3d at 745). It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved. *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S. 683, 705 (1974). The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 1114, that applies to (1) "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both the government and former president's counsel confirmed, at issue in this motion is the presidential communications privilege. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[4] That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege. *Protect Democracy Project*, 10 F.4th at 885–86

---

[4]     "All hearings on matters affecting a grand jury proceeding shall be closed." D.D.C. LCRR 6.1. ▮▮▮

(quoting *In re Sealed Case*, 121 F.2d at 745–46). This distinction is important because of what the presidential communications privilege seeks to do. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020). To ensure the rigorous honesty and due diligence required of presidential policymaking, the presidential communications privilege thus serves as a shield to disclosure of those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted). That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process. *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886. Throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States." *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected

from the mass of the people" and is thus subject to the "general provisions of the constitution"

including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense).

Consequently, any presumption of immunity conferred to a president "must be considered in

light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708,

in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they

are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418

U.S. at 710) (internal quotations omitted).

In practice, that qualified status means that the privilege does not apply to all forms of

presidential communications with the same levels of deferential protection and, ▮▮▮▮▮▮▮▮

▮▮▮▮, the parties agreed that three categories of presidential communications have varying

levels of, or no, such protection. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "Core communications," the most protected category, refers to

communications regarding military, diplomacy, or sensitive national security secrets that are

entitled to the most deference for privileged nondisclosure. *See GSA*, 433 U.S. at 446–47; *Nixon*,

418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has

"implied . . . that particularized claims of privilege for military and state secrets would be close

to absolute, and expressly held only that the presidential communications privilege, which is

based only on a generalized interest in confidentiality, can be overcome by an adequate showing

of need"). This would certainly include classified information, the unauthorized disclosure of

which "could reasonably be expected to cause identifiable or describable damage to the national

security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). In descending order

of protection, next is the "generalized communications" category, which extends the privilege

beyond the nation's most guarded information aforementioned to also cover communications

relating to "the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711–12; *see*

*GSA*, 433 U.S. at 446–47. Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties. *See Nixon*, 418 U.S. at 705; *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)). Certainly, for instance, the president's sandwich order at lunch is in the last category and is entitled to no privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties.

### B. Presidential Communications Privilege Covers the Compelled Testimony at Issue

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel from ████████████ and whether any level of privilege has been waived or inadequately asserted. The government takes the position that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021.

████████████████████████ [5] The former president counters that communications regarding January 6, 2021, were in fulfillment of his

---

[5]     *See also* Gov't's *Ex Parte* Mem. at 14 n.2.

constitutional duty to "take Care that the Laws be faithfully executed," ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████, and so constitute core communications involving "election integrity" and "national security," subject to the utmost privilege deference, ████████████

███████. Yet, the former president does not suggest that the compelled testimony at issue is at the level of military or diplomatic secrets or in any way requires national security classification such that "absolute" protection may be appropriate. *See In re Sealed Case*, 121 F. 3d at 743 n.12.

Each party is partially correct. The communications at issue do not involve matters of the utmost confidentiality and so "absolute" deference to the presidential communications privilege is not appropriate. They do not involve confidential military or diplomacy secrets. Despite the former president's best efforts to shoehorn the ██████ topics the government flags for the grand jury witnesses' testimonies into the realm of national security secrets, ████████████

██████████████, that effort falls flat because many of those topics concern ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ ████████—and have no relation to secrets capable of causing damage to national security, as the former president's counsel has admitted, ████████████████████████. That said, the communications implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need. *See infra* II.C.

The government next contends that President Biden's decision not to assert executive privilege over the testimonies of ████████████ requires the former president's assertion of privilege to "yield." ██████████████████ The former president highlights, however, that the Supreme Court recently and expressly held this question open, ████████ ████████████████████████ and counters that a presidential successor cannot "invade" or waive the privileged communications of his predecessor because that would surely temper candor in the decisionmaking process, ████████████ ██████████████████.

The government then proffers that the former president failed to make an assertion of privilege specific enough to identify which communications qualify for protection and why. ██████████████████.[7] The former president retorts that he made the most specific assertion of privilege possible given the general nature of the ████ topics for testimony enumerated in the cover letters sent to ████████ and that he has no other obligation to be any more specific. ██████████████████████ ████

The Court need not enter this fray because the presumption that the communications are privileged quickly disposes of these disputes. Therefore, the issue addressed next is whether the government has sufficiently overcome the presidential communications privilege to warrant compelling the witnesses to testify fully before the grand jury.

C.     **Presidential Communications Privilege Does Not Bar Compelled Testimony**

Under the presumption that the compelled testimony at issue is protected from disclosure by the presidential communications privilege, the resolution of this motion falls squarely—and

---

6
7    ██████████████████

dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the Counsel to the President for records prepared in connection with an investigation of the former Secretary of Agriculture. In recounting the history and scope of the presidential communications privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential communications privilege yields to a demonstrated specific need in certain settings, such as congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744 (citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a sufficiently strong showing of litigating need")); and most relevant to the pending motion, criminal proceedings, *see id.* at 753 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at 717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this case.")). The Circuit then posited "what type of showing of need" was necessary "to overcome the privilege" in the grand jury context. *Id.*

What resulted is the standard of need test, *id.* at 754, which both parties agree applies here, ▮▮▮▮▮▮▮▮▮▮▮▮▮. The test directs that "[a] party seeking to

overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." *In re Sealed Case*, 121 F.3d at 754; *see also id.* at 759–62 (application of the two-prong test). Under the first prong, "important evidence" is "directly relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not merely with the purpose of impeachment of witnesses or discussion of tangential issues. *Id.* at 754–55; *see also Nixon*, 418 U.S. at 701; *Bowman Dairy Co. v. United States*, 341 U.S. 214, 219 (1951); *In re Martin Marietta Corp.*, 856 F.2d 619, 622 (4th Cir. 1988). The second prong requires a showing of "unavailability," that the evidence sought "should not be treated as just another source of information," but rather that efforts were made to obtain the information elsewhere and why those efforts were not fruitful. *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the public interest in protecting the executive's unique use of highly confidential information and need for candor and the public interest in disclosing material helpful and relevant to criminal investigations. In establishing the qualified nature of executive privilege, the Supreme Court in *Nixon* noted that "a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of a 'workable government' and gravely impair the role of the courts under Art. III" in a criminal proceeding. 418 U.S. at 707. Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in disclosure to a grand jury outweighed the public interest in protecting executive privilege. *Sirica*, 487 F.2d at 716–17. Given that those cases "clearly establish that the presidential communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and

21

enforcing the law." *In re Sealed Case*, 121 F.3d at 753; *cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege). In short, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, in the grand jury context, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is "baked into" the two-prong test from *In re Sealed Case*. ▮▮▮▮▮▮▮▮▮▮▮.

Before analyzing how both prongs of the standard of need test apply to the testimony sought to be compelled before the grand jury here, the former president's novel proposal for a threshold test for the government to overcome is addressed.

### 1. *Former President's Proposed Threshold "Viability" Test*

The former president seeks to tweak the straightforward and well-settled standard of need test. He argues, initially in his brief, that "[a]ny evaluation of need must also be made in the context of the viability of the underlying investigation" such that, "if the premise of the underlying investigation is flawed, then there is no actual 'need' to invade the privilege." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ To establish "viability," he further asserts that the government must prove "beyond a reasonable doubt" that, *inter alia*, "(1) there was no fraud in the 2020 Presidential election, or, at minimum that any fraud was insufficient to affect the outcome; and (2) that President Trump knew that there was no fraud and falsely claimed that there was fraud with intent to deceive." ▮ Doubling-down on his critique of the ongoing grand jury investigation in terms more appropriate in summation at trial, the former president continued that "the Government cannot prove there was *no* fraud or irregularities in the 2020 Election" when "indeed such irregularities and specific instances of fraud [were] identified," ▮▮▮▮▮▮▮▮▮

████, and, further, that "the Government cannot prove corrupt intent or an intent to deceive" since "[i]t is simply not a crime to question the integrity of an election," ██, nor can the "Government [] establish any connection between President Trump and the alleged criminal conduct on January 6, 2021," ██

████████████, counsel for the former president walked back the assertion that, at this investigative juncture, the government must present proof beyond a reasonable doubt, ███ ████████████████, and instead urged the Court to "drill down into the definition of important evidence" in the first prong of the standard of need test by considering whether the evidence sought is "directly relevant to issues that are expected to be central in the trial," which must include questions of potential criminality and not political disagreement, ██████████. Central to the former president's "viability" theory is that the instant grand jury investigation merely probes disagreement among the former president, the former vice president, and their key advisors over aggressive political machinations challenging the 2020 presidential election results, when such machinations do not amount to criminal conduct. ████████████



Precedent counsels strongly against accepting the former president's invitation to short-circuit the grand jury's investigation by requiring an initial threshold judicial inquiry into investigative "viability," for at least two reasons. First, the grand jury, not the Court, decides "whether or not a crime has been committed." *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991). The grand jury has a "unique role," *id.*, "enshrined in the Constitution," to "'determin[e] if there is probable cause" and to "protect[] citizens against unfounded criminal

prosecutions,'" *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423 (1983) (citing *Branzburg v. Hayes*, 408 U.S. 665, 686–87 (1972)). For this strong public interest in allowing the grand jury to carry out this constitutional role, the presidential communications privilege may give way to the grand jury's authority. *In re Sealed Case*, 121 F.3d at 756; *see also Sirica*, 487 F.2d at 712–13.

In practice, if the evidence, or lack thereof, before the grand jury does not point to criminal activity, then the grand jury will end its investigation accordingly without issuing indictments and without unfairly implicating innocent persons in the public sphere. *See Wood v. Georgia*, 370 U.S. 375, 390 (1962) ("Historically, [the grand jury] has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused."). If, on the other hand, the evidence is sufficient to support probable cause to believe that a person committed a specific crime, the grand jury is tasked with the duty of presenting an indictment. After presentment of an indictment, the prosecutors have the job of persuading a petit jury beyond a reasonable doubt that a defendant, who was the target of the grand jury's investigation, committed the charged violation of criminal law.

Judicial intervention to prejudge the "viability" of a grand jury investigation is an obvious usurpation of the grand jury's role and is wholly inappropriate. The former president's invitation for this Court to engage in such usurpation is an obvious effort to frustrate the grand jury's consideration of the very issue with which the grand jury is tasked, namely, to determine whether probable cause indicates a crime was committed and, if so, by whom. Cutting off the grand jury investigation now by starving it of information subject to the presidential communications privilege might ultimately spare the former president from having to persuade a petit jury that he and his close associates engaged merely in aggressive political maneuvering on

multiple fronts and crossed no line into illegality, such as a criminal effort to obstruct Congress's official proceeding to certify the results of the 2020 presidential election. Such line-drawing is assigned under our criminal justice system, as an initial matter, to the grand jury. "The grand jury requires no authorization from its constituting court to initiate an investigation" and, in its daily work, the grand jury "swears in its own witnesses . . . and deliberates in total secrecy." *United States v. Williams*, 504 U.S. 36, 48 (1992) (citing FED. R. CRIM. P. 6(c)). This Court declines the former president's invitation to insert itself into matters constitutionally tasked to the grand jury. *See id.; see also* U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.").

Second, the threshold for matters the grand jury may investigate is suspicion of criminality, not the viability of criminal charges before a petit jury. "The grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *R. Enters.*, 498 U.S. at 297 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)). While "grand juries are prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass,'" *Trump v. Vance*, 140 S. Ct. at 2428 (quoting *R. Enters.*, 498 U.S. at 299), "the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority," *R. Enters.*, 498 U.S. at 300–01; *see also United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring in judgment) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.").

As the grand jury progresses in its inquiry, its fact-finding mission centers on reasonableness and relevancy. The "necessary consequence of its investigatory function" permits the grand jury to probe "all information that might possibly bear on its investigation until

it has identified an offense or has satisfied itself that none has occurred," thereby allowing it to "paint[] with a broad brush." *R. Enters.*, 498 U.S. at 297. That broad authority, however, has limits. "[A] grand jury subpoena issued through normal channels is presumed to be reasonable," unless its recipient persuades a district court that there is "no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *Id.* at 301. Thus, the contours for initiating and conducting grand jury investigations are clear, and the former president has made no showing, absent conclusory allegations unsupported by evidence, that any act of the grand jury's investigation thus far has been improper or even unreasonable.

Having rejected the former president's restructuring of the standard of need test, the remaining task is to apply that test to the facts of the pending motion.

### 2. *Application of the Standard of Need Test*

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for the withheld testimony involves examining both the matters under investigation by the grand jury and whether the testimony could potentially shed important light on those matters. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

     As to whether the testimony of ██████████ could potentially shed important light on

those matters, the answer is clearly affirmative. ████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Relevant to the test's second prong, no alternative to this evidence is available. Of the participants in the communications [REDACTED], these two witnesses possess unique and inimitable evidence. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████ █ █████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

On these grounds, ███████████████ possess vital evidence for the grand jury, the

importance and unavailability of which outweigh the presidential communications privilege in

this case.

██    ███████████████

███████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

██████████████████████  ██████  █████████████████████

---

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████

### E. Former President's Suggested Additional Procedures

Finally, the former president requests that the Court impose additional, and extraordinary, procedures before this grand jury investigation may proceed. These requests are denied.

First, the former president demands that, "if the Government has ████████████ ██████████ justified its need for the privileged testimony it seeks," as the government has done, *see supra* Part II.C, "[t]he next step in the process is *in camera* review by this Court to ensure that only evidence relevant to the grand jury's inquiry is disclosed," ████████████████ (citing *In re Sealed Case*, 121 F.3d at 742, and *Sirica*, 487 F.2d at 719–22). The former president is mistaken. When the D.C. Circuit permitted that *in camera* review procedure in *In re Sealed Case* and *Sirica*, such review was necessary to determine whether the previously acquired evidence was relevant to the grand jury's investigation. *In re Sealed Case*, 121 F.3d at 745; *Sirica*, 487 F.2d at 719. As already explained, █████████████████ prospective grand jury testimonies are highly relevant to the grand jury's investigation. Review of the ████ topics the government seeks to ask the grand jury witnesses suffices to show the direct relevance of ████ ██████████ testimonies to the grand jury's investigation. ████████████████████. Thus, *in camera* review of their anticipated testimony would be superfluous in assessing relevancy and result only in additional delay to the grand jury's proceedings.

Moreover, the former president does not reckon with the difficult logistics of conducting *in camera* review of yet-to-be-given grand jury testimony. Courts were able to conduct *in camera* review of potential grand jury evidence in *In re Sealed Case* and *Sirica* because that evidence consisted of pre-existing and complete records—documents in *In re Sealed Case*, 121 F.3d at 734, and tape recordings in *Sirica*, 487 F.2d at 704–05—not testimony as here. The former president downplays how extraordinary his request is. He essentially asks that grand jury

witnesses, typically unknown to the judge supervising the grand jury, provide prospective

testimony in the form of proffers to the Court, which otherwise has no role in presenting

evidence to the grand jury. In other words, the former president apparently envisions that the

Court will elicit and review the prospective grand jury witness's proffer to decide whether and

what aspects of that testimony are relevant to the grand jury's investigation, despite the fact that

government counsel has the most comprehensive knowledge of the evidence already gathered

and presented to the grand jury. Indeed, review of the transcripts of ▓▓▓▓▓▓ prior

grand jury testimonies reveal to which questions they invoked ▓▓▓▓ on behalf of the former

president, but those transcripts say nothing about the line of questioning the government may

pursue in follow-up and to clarify other information already presented to the grand jury.[10] The

government is in a far better position than the Court to elicit that information effectively and

efficiently. The former president's request would have the Court doing the government's job of

probing *grand jury witnesses*, and that is certainly impermissible. *See Williams*, 504 U.S. at 48.

What is obvious is that the overall process proposed by the former president would

necessarily involve multiple steps, beginning with this Court conferring with the government

over the anticipated testimony to ascertain the overall status of the grand jury investigation in

order to assess the relevancy of the particular witnesses' testimony; conducting proffers of the

grand jury witnesses; examining those proffers to determine what is relevant, or not, to the grand

jury investigation; instructing the government and grand jury witness as to those relevance

determinations, to ensure that any forthcoming testimony was appropriately cabined; and,

perhaps, reviewing the grand jury testimony itself to ensure compliance with the relevance

determinations. This process would be time-consuming and potentially sufficiently fraught with

errors as to frustrate the grand jury investigation. The Supreme Court has wisely cautioned

---

10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

38

against "saddl[ing] a grand jury with minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *R. Enters.*, 498 U.S. at 298–99 (citing *United States v. Dionisio*, 410 U.S. 1, 17 (1973)). The former president's proposal for some version of *in camera* review of the grand jury witnesses' testimonies invites just such meddling to encumber the grand jury's authority. This proposal is rejected.

Second, the former president requests that the Court stay a ruling on this motion until a record is created for any additional grand jury witnesses that may or are anticipated to assert executive privilege. ███████████████ The former president references two potential witnesses—███████████████████████████████████████ ███████████████████████—that he predicts will be called to testify before the grand jury relevant to this investigation and will invoke executive privilege to block disclosure of certain topics as did ████████████ ████ ████ The former president claims that judicial economy favors consolidating the motions to compel for all four witnesses, so the Court need only make one disposition.████ ████.

The former president is incorrect. The nature of what each witness knows and their differing positions in the White House and in relation to the former president necessitate individualized review of their privilege claims. The former president admitted as much ████

████████████ ████████████████████████████████████, █████████████████████████████████████████, ██████████████████████████████████████████████████.

The former president's request also requires too much speculation. No motion to compel ████████████ grand jury testimonies has been filed, and the Court does not operate on

conjecture. *See Thompson*, 20 F.4th at 24 ("[C]ourts should not reach out to evaluate a former president's executive privilege claim based on future possibilities for constitutional conflict." (internal citations omitted)). In this circumstance, judicial economy actually favors handling existing matters as they come before the Court based on the facts at hand rather than creating reasons to delay an ongoing grand jury investigation for motions that have yet to be filed.

Finally, the former president asserts that, "even if this Court concludes that the presidential communications privilege alone is an insufficient ground to withhold testimony, [he] is entitled to an opportunity to raise more particularized claims of privilege."

██████ this request is dependent on the success of the former president's consolidation request: The former president wants to preserve an opportunity to assert additional privileges relevant to ██████ testimonies post-consolidation. ██████. This suggested procedural request is rendered moot, however, by rejection of the former president's request for consolidation.

## III.  CONCLUSION

Based on the foregoing analysis, the presidential communications privilege presents no bar to eliciting testimony before the grand jury from ██████, ██████, and ██████, ██████. ██████. Accordingly, the government's motion to compel testimony from these two grand jury witnesses is GRANTED.

Date:  September 28, 2022

BERYL A. HOWELL
Chief Judge