# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE GRAND JURY SUBPOENAS

█████████████████

Case No. 22-gj-33 (BAH)

Chief Judge Beryl A. Howell

**UNDER SEAL**

**EX PARTE TO GOVERNMENT ONLY**

## MEMORANDUM OPINION



In ██████, a grand jury sitting in this District and investigating conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant temporary halt of the constitutionally mandated congressional certification of the Electoral College vote for the 2020 presidential election, issued subpoenas for testimony to ████████████████████ ███████████████████████████████████████████████, during the relevant period of the presidential administration of Donald J. Trump.  In ████████████ both witnesses appeared separately before the grand jury and declined to respond to certain questions by invoking executive privilege ███████████████, pursuant to directions given to each witness by former president Trump.  The government now moves to compel the witnesses' withheld testimony because the grand jury's need for the important information overcomes the former president's privilege claims.

For the reasons explained below, the government's motion is granted.

## I.   BACKGROUND

The grand jury's need for testimony ███████████████ stems directly from these witnesses' knowledge of events leading up to the certification of Electoral College votes by a Joint Session of Congress on January 6, 2021.  ████████████████████████ ██████████████████████████████.  Investigation into these events has been

1

ongoing and described at length in a prior opinion relevant to compelling the grand jury testimony of ████████████████████████████████████████████ ████████████████████████████████████.  *See* Memorandum Opinion, *In re Grand Jury Subpoenas*, No. 22-gj-25, ECF No. 18 at 2–12 (Sept. 28, 2022) ("Sept. 2022 Mem. Op.").  The January 6 events have also been diligently recounted by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir. 2021), and described by witnesses under oath at public hearings before the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("House Select Committee" or "HSC").  These facts relevant to the instant witnesses are summarized below.

A.    **2020 Presidential Election and Other Events Leading to January 6, 2021, Joint Session of Congress**

In the November 2020 presidential election, more than 81 million Americans, or 51.31% of the electorate, voted for Joseph Biden as president, overcoming approximately 74 million votes cast for Donald J. Trump.  *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-content/documents/2020presgeresults.pdf.  Nonetheless, the former president "refused to concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud and irregularities."  *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Nov. 18, 2022)).  The former president and his allies filed numerous legal challenges to election results across the country, none of which proved successful.  *Id.*

In a last-ditch effort, individuals associated with the former president, the White House, and the former president's election campaign team attempted to influence the Electoral College vote scheduled for December 14, 2020, by urging the former president's supporters in closely

contested states, in which candidate Biden won, to self-declare as duly appointed and qualified electors and cast votes for the former president on December 14 on fraudulent elector certificates. *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 00:54:46–1:04:32, available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-attack-us-capitol (last accessed on Nov. 18, 2022) (describing the fake elector scheme).[1]  The former president's supporters took steps towards this desired end



in Arizona, Georgia, Michigan, Nevada, Wisconsin, New Mexico, and Pennsylvania—all states won by President Biden. ███████  This effort failed in those seven states after all duly appointed electors cast votes on December 14, 2020, for President Biden. ███████

The former president and his operatives then shifted strategy, moving their focus from the Electoral College vote to the electoral vote certification.  As constitutionally required by the Twelfth Amendment, the Electoral College votes cast on December 14, 2020, were then certified by a Joint Session of Congress convened on January 6, 2021, in a proceeding presided over by the former vice president, who was to call for objections to the vote and, after all objections were resolved by the two congressional houses and the count was complete, announce the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3 (describing the congressional meeting of electors and vote certification); 3 U.S.C. § 15 (process describing the counting of electoral votes in Congress).  The former president, "[i]n anticipation of that event, . . . had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that he claimed would be "'wild.'"  *Thompson*, 20 F.4th at 17 (quoting Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████





"Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse" and, during his "more than hour-long speech," repeated his claims of a "rigged" election. *Thompson*, 20 F.4th at 17–18. During that speech, the former president specifically urged the former vice president "to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18 (quoting Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed Nov. 18, 2022) ("January 6th Rally Speech")). The former president also encouraged his supporters to go to the Capitol to "demand that Congress do the right thing" by refusing to certify the votes and to "fight like hell" or else "you're not going to have a country anymore." *Id.* (citing January 6th Rally Speech at 3:47:20–

---

4 ███████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

3:47:42, 4:41:17–4:41:33).  At that rally, the former president's private attorney Rudolph

Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral

vote certification under the Electoral College Act and called for "trial by combat."  John Eastman

and Rudolph Giuliani, January 6th Rally Speech at 2:22:07–2:22:10.  Eastman added that "all we

are demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures

of the state look into this so we get to the bottom of it and the American people know whether

we have control of the direction of our government or not."  *Id.* at 2:26:54–2:27:12.

As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently

broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed

Congress's vote certification.  *Thompson*, 20 F.4th at 18–19.  Due to the catastrophic security

breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from

the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the

Capitol, amid calls from the crowd to hang Vice President Pence."  *Id.* at 18.  The former

president did not request support for law enforcement members, many of whom were assigned to

protect the former vice president.  *Hr'g on Jan. 6th Investigation Before the H. Select Comm. to

Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC

Hr'g Tr. (July 21, 2022)") at 34:48–36:02, available at https://www.c-span.org/video/?521771-

1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Nov. 18, 2022).

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

███████████████████

As the events unfolded at the U.S. Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol.  For example, on January 6, 2021, the Federal Bureau of Investigation ("FBI") made an emergency request to a social media platform for non-content user identification information of users who broadcasted live video or uploaded videos from physically within the Capitol building when it was occupied by unauthorized persons, to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry, disorderly conduct, and other offenses on Capitol grounds)).  *See United States v. Bledsoe*, No. 21-204 (BAH), 2022 U.S. Dist. LEXIS 150326, at *9, *12 (D.D.C. Aug. 22, 2022) (denying motion to suppress fruits of FBI's emergency request, on January 6, 2021, to Facebook for non-content user-generated location information ("UGLI") derived from user-generated content posted from inside the Capitol building during the attack).  Since then, hundreds of individuals have been investigated, charged, and convicted in this District for their criminal conduct in planning for and participating in the breach of the Capitol that resulted in disruption of the official proceeding of Congress to certify the results of the 2020 presidential election.

    **B.**    **Instant Grand Jury Investigation**

████████████████████████████████

████████████████████████████████████

███████████████████████████████

███████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████

█████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████.

██████████████████████

**C.**    **Procedural History**

████████████████ the grand jury issued subpoenas ██ ████████████████████████

████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

██████████. The witnesses were initially scheduled to testify before the grand jury ████████████

████████████ but by agreement, the testimonies were rescheduled ████████████████ ██

████████████████████████████████████

███████████████████████████████████

█████████████████████████████████



██████████████████████████████████████████████

████████████████████████████

Anticipating the former president's privilege assertions over the witnesses' testimonies,

given his similar assertions over these witnesses' statements to the House Select Committee,

████████████████████████████████████████████████████,

██████████████, the government sought, with the consent of the witnesses' counsel, ███████ an

order from this Court "permitting the Government to discuss the grand jury subpoenas for

██████████████████ with counsel for the incumbent and former Presidents[,]" which included

"communicating with the Office of White House Counsel (for the incumbent President)" and

counsel for the former president, ████████ Such discussions would enable the government to

"ascertain whether any potential privilege holder – including the incumbent and former

Presidents – intends to instruct the witnesses not to testify based on an assertion of executive

privilege[,]" ████████ and thereby remove "the onus of these consultations" from the witnesses, ██.

██ The government's motion was granted that day. Order Authorizing Disclosure of Grand

Jury Material, ECF No. 5.

Accordingly, the government notified the White House Counsel's Office ██████ ███████

██████████ ████████████████████████, and inquired whether President Biden would assert

executive privilege to bar the witnesses' testimonies. ████████████████████████

████████████████████████████████████████████████████████

The White House Counsel's Office responded on ████████████████, that President Biden "will not

assert executive privilege" with respect to the two witnesses' testimonies. ████████████████

---

5    The government filed an initial motion seeking a disclosure order on July 25, 2022, █████████
                                                    and then submitted an amended motion
the next day, ████████████████████████████████████████████████████████████        The
motions are generally identical with the exception of additional paragraphs regarding ████████████
████████████████████████████
                    As such, only the amended motion is described above.

████████████████████████████████████████

████ The White House Counsel's letter elaborated that "President Biden recognizes the importance of candid advice in the discharge of a President's constitutional responsibilities and believes that, in appropriate cases, executive privilege should be asserted to protect either current or former White House senior staff from having to testify about conversations concerning the President's exercise of his duties." ████ That said, given "the extraordinary events surrounding" the January 6 attack on the Capitol and the "unique circumstances" presented by such an unprecedented event, President Biden determined "that an assertion of executive privilege is not in the public interest with respect [to] the efforts to thwart the orderly transition of power under our Constitution." ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

The government communicated the same request to the former president's counsel by letter ████████████████████████████████████ ████████████, the government raised the former president's knowledge of the grand jury's ongoing investigation through notification of the ████████ subpoenas and, more specifically, the government's prior disclosure to him of ████ topics about which ████████ ████ were to be questioned before the grand jury. ████████████████████████████

████████████████████████████████████████

████████████████ before the witnesses' scheduled grand jury testimony, the former president's counsel sent directly to counsel ████ ████████████ letters instructing that they were "to the fullest extent permitted by law, . . . not to provide testimony about, or

reveal in any forum, privileged communications and correspondence, including information covered by executive privilege, ██████████████, and any other applicable privilege."

████████████████████████████████████████████████

████████████████████████████████████████ These letters on behalf of the former president express the view that the "real purpose" of the government's "entire" investigation into January 6 is to "attack [former] President Trump and the Republican party" in the months before the November 2022 midterm election, ██████████

██, adding that "there is an expectation of confidentiality in a President's conversations and correspondence with the people who advise and assist him," which "confidentiality is protected under the United States Constitution and all such communications are presumptively privileged," ██ The letters then clarify that the former president specifically invokes the presidential communications privilege. ██

████████████████████████████████████████████████

██████ and, pursuant to the former president's instruction, each witness declined to answer multiple questions, citing executive privilege ██████████████████████

██████████████, the government moved to compel ██████████████ to testify to those excluded topics, listing as respondents the ██ grand jury witnesses and the former president. ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

6 ████████████████████████████████████████
████████████████████

███████████████████████████████████████████████████████████████

████████████████████████

Simultaneous with these filings, the government requested permission for limited

disclosure ██████████████ to the witnesses and the former president subject to certain

protections. ██████████████████████████████████████████████

███████████████████████████████████████████ The government's

request for a disclosure and protective order was granted ████████████████, pursuant to Local

Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which together prohibit the

public release of proceedings on a motion connected with a grand jury subpoena or matter before

the grand jury unless ordered by the Court to "advance the important public and private interests

served by the grand jury secrecy requirement." Order Authorizing Limited Disclosure, Imposing

Protection and Entering Briefing Schedule ("Protective Order") at 1, ECF No. 8.[8]

After conferral, the parties agreed to a briefing schedule consistent with the time

requirements of Local Criminal Rule 47(b), giving the former president fourteen days to respond

to the government's motion and the government seven days to submit a reply. Min. Order (Oct.

21, 2022); *see also* Resp. Order of the Court, ECF No. 9 (parties' recommended briefing

schedule). Having submitted no request for oral argument on the motion, the parties rested on

the arguments presented in their papers.[9] The government's motion is now ripe for review.



14

## II.  DISCUSSION

Given the former president's invocation of only the presidential communications privilege, that species of executive privilege is solely at issue here. *See In re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997) (describing the expansive doctrine of executive privilege). This privilege is first described generally and in the grand jury context before turning to the separate issues of whether the former president's invocation of the presidential communications privilege ▮ operates to bar the compelled testimony of ▮ ▮ . Upon review, neither privilege claim succeeds because the significant need for the important evidence outweighs any interest in keeping information from the grand jury. [10]



[10]

understanding of the former president's instructions for their testimony before the grand jury as carrying forward the

A.      **Executive Privilege Generally**

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id*. § 3, to name a few. Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff. As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d 729, 736 (D.C. Cir. 1997).

The privilege granted to the executive branch has two distinct species, each derived from the same recognized need to protect executive branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege. *See id*. at 745. The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing *In re Sealed Case*, 121 F.3d at 745). It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved. *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S. 683, 705 (1974). The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 885, that applies to (1) "communications

16

directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both the parties confirmed, at issue in this motion is the presidential communications privilege. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege. *Protect Democracy Project*, 10 F.4th at 885–86 (quoting *In re Sealed Case*, 121 F.2d at 745–46). This distinction is important because of what the presidential communications privilege seeks to do. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020). To ensure the rigorous honesty and due diligence required of presidential policymaking, the presidential communications privilege thus serves as a shield to disclosure of

17

those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process."  *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted).  That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."  *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process.  *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886.  Throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States."  *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected from the mass of the people" and is thus subject to the "general provisions of the constitution" including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense).  Consequently, any presumption of immunity conferred to a president "must be considered in light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at 710) (internal quotations omitted).

In practice, that qualified status means that the privilege does not apply to all forms of presidential communications with the same levels of deferential protection.  Rather, there are

three separate categories of presidential communications with varying levels of, or no, such protection. "Core communications," the most protected category, refers to communications regarding military, diplomacy, or sensitive national security secrets that are entitled to the most deference for privileged nondisclosure. *See GSA*, 433 U.S. at 446–47; *Nixon*, 418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, and expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This would certainly include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). In descending order of protection, next is the "generalized communications" category, which extends the privilege beyond the nation's most guarded information aforementioned to also cover communications relating to "the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711–12; *see GSA*, 433 U.S. at 446–47. Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties. *See Nixon*, 418 U.S. at 705; *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)). Certainly, for instance, the president's lunch order is in the last category and is entitled to no

privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties.

**B.    Presidential Communications Privilege Covers the Compelled Testimony at Issue**

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel from ███████████████, and whether any level of privilege has been waived or inadequately asserted.  The government first posits that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021, and thus are not presidential communications at all.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

The former president responds that the communications in question are presidential within the privilege's utmost protection because they involve "[s]afeguarding the integrity of federal elections through the faithful execution of the law," which, he claims, "is a fundamental duty of the President of the United States." ████    He then points to five amendments to the Constitution that each "concern[], at least in part, federal elections," as well as 52 U.S.C. § 10101 *et seq.*, the section of the U.S. Code on voting and elections, as the laws he sought to faithfully execute. ██████.[12]  The former president then declares that "the integrity of a federal election is a matter of national security[,]" ████ because of "the potential for interference in

---

[11]    ████████████████████████████████

[12]    The former president specifically refers to the following constitutional amendments:  the Twelfth Amendment on electoral votes for president and vice president; the Twentieth Amendment on the beginning and end dates for presidential and congressional terms; the Twenty-Second Amendment on presidential term limits; the Twenty-Third Amendment on the right of District of Columbia residents to participate in presidential elections; and the Twenty-Sixth Amendment on the right of citizens over age 18 to vote. ████████████████

the administration of federal elections" and the requirement that the "election process is fair, transparent, and conducted in accordance with the law," ▮▮▮▮. Consequently, in the former president's view, "[w]hen a President speaks with his top legal advisors about the transparency, legality, and integrity of a presidential election, those conversations must be full, frank, and candid[,]" thus amounting to a privilege from disclosure that is "essentially absolute," ▮▮▮▮ (citing *In re Sealed Case*, 121 F.3d at 743, n.12).

Each party is partially correct. To begin with the former president's position that the communications at issue involve matters of the utmost confidentiality, entitled to nearly "absolute" deference under the presidential communications privilege, he is incorrect. The communications at issue do not involve confidential military or diplomacy secrets. Nor does the former president claim that the communications concern classified information that would risk damage to national security upon unauthorized disclosure. Despite the former president's best argument that communications concerning the 2020 presidential election are national-security focused and thus any knowledge the witnesses have of these communications is privileged, this argument is unavailing for at least three reasons. First, the events on January 6, 2021— including, among other things, the rally that day, its planning and organization, law enforcement's response, and Congress's conduct in an official proceeding, ▮▮▮▮▮▮▮▮ ▮—were public and have no relation to secrets capable of causing damage to national security. Second, the government's topics of inquiry do not concern matters of election security. Rather, they include, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████████████

████████████████████████████████████ Third, much like waiver that is well-recognized in

the attorney-client-privilege doctrine, *see, e.g.*, *In re Sealed Case*, 121 F.3d at 741 (describing

the "all-or-nothing approach" to waiver of attorney-client privilege); *United States v. White*, 887

F.2d 267, 271 (D.C. Cir. 1989) (holding that disclosure of the "substance" of communications

amounts to waiver), many of the discussions concerning alleged "election security," as defined

by the former president, occurred in the presence of non-Executive Branch officials, █████

████████████████████████████████.[14] The former president

cannot claim that "core communications" so integral to his commander-in-chief duties are

subject to the utmost deferential privilege when he did not treat them as such.[15]



That said, the communications at issue implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need. *See infra* II.C.[16]

The government next contends that President Biden's decision not to invoke executive privilege over the testimonies of ▮▮▮▮▮▮▮▮▮▮ requires the former president's assertion of privilege to "yield." ▮▮▮▮▮▮▮▮▮▮[17] The former president highlights, however, that the Supreme Court recently and expressly held this question open, ▮▮▮▮▮▮ ▮ (citing *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Mem.)), and counters that if a presidential successor could waive the privileged communications of his predecessor, "the presidential communications privilege would be a nullity," ▮ The former president concludes that "[t]here is no doubt that an assertion of executive privilege survives a President's tenure in office." ▮ (citing *GSA*, 443 U.S. at 448–49).

The government then proffers that the former president's privilege invocation was "too vague and generalized to demonstrate which communications at issue arguably qualify for the

---

[16]     The former president also argues that the government's failure to provide a factual basis for its assertion that the communications in question are not presidential communications means that the government "has not met its burden of overcoming the presumption of privilege." ▮▮▮▮▮▮▮▮ The Court need not reach this issue given its adopted presumption that the communications at issue are privileged.

[17]     ▮▮▮▮▮▮▮▮▮▮▮▮

presidential-communications privilege." ███████████.[18] The former president retorts

that his privilege invocation "was as specific as possible" given that the government "has not

identified [to him] the specific questions that ███████████ declined to answer."

███████████.

The Court need not enter either fray because the presumption that the communications

are privileged quickly disposes of these disputes. Therefore, the issue addressed next is whether

the government has sufficiently overcome the presidential communications privilege to warrant

compelling the witnesses to testify fully before the grand jury.[19]

## C.   Presidential Communications Privilege Does Not Bar Compelled Testimony

Under the presumption that the compelled testimony at issue is protected from disclosure

by the presidential communications privilege, the resolution of this motion falls squarely—and

dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether

executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the

Counsel to the President for records prepared in connection with an investigation of the former

Secretary of Agriculture. In recounting the history and scope of the presidential communications

privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential

communications privilege yields to a demonstrated specific need in certain settings, such as

congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d

at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether

---

[18]   

[19]   While still preserving its argument that the communications in question are not presidential
communications, ███████████ 1, the government urges the Court to set those issues aside by assuming
that the communications to which ███████████ would testify are presumptively privileged and thus to
focus on whether the grand jury's need for the evidence is important to its investigation and not available elsewhere
with due diligence, thereby outweighing the former president's privilege claim ███████████ The Court
agrees that this focus is dispositive.

24

the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the

Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly

must yield to the important congressional purposes of preserving the materials and maintaining

access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744

(citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the

Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential

communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a

sufficiently strong showing of litigating need")); and most relevant to the pending motion,

criminal proceedings, *see id.* at 753–54 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at

717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail

in the face of the uniquely powerful showing made by the Special Prosecutor in this

case.")).  The Circuit then posited "what type of showing of need" was necessary "to overcome

the privilege" in the grand jury context.  *Id.*

What resulted is the standard of need test, *id.* at 754, which both parties agree applies

here, ███████████████████████████████.  The test directs that "[a] party seeking to

overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the

subpoenaed materials likely contains important evidence; and second, that this evidence is not

available with due diligence elsewhere."  *In re Sealed Case*, 121 F.3d at 754; *see also id.* at 759–

62 (application of the two-prong test).  Under the first prong, "important evidence" is "directly

relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not

merely with the purpose of impeachment of witnesses or discussion of tangential issues.  *Id.* at

754–55; *see also Nixon*, 418 U.S. at 701.  The second prong requires a showing of

"unavailability," that the evidence sought "should not be treated as just another source of

information," but rather that efforts were made to obtain the information elsewhere and why those efforts were not fruitful.  *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the public interest in protecting the executive's unique use of highly confidential information and need for candor and the public interest in disclosing material helpful and relevant to criminal investigations.  In establishing the qualified nature of executive privilege, the Supreme Court in *Nixon* noted that "a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of a 'workable government' and gravely impair the role of the courts under Art. III" in a criminal proceeding.  418 U.S. at 707.  Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in disclosure to a grand jury outweighed the public interest in protecting executive privilege. *Sirica*, 487 F.2d at 716–17.  Given that those cases "clearly establish that the presidential communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and enforcing the law."  *In re Sealed Case*, 121 F.3d at 753.[20]  In short, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is inherent in the two-prong test from *In re Sealed Case*.

---

[20]    *Cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege).

### D.    Application of the Standard of Need Test

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for the withheld testimony involves examining both the matters under investigation by the grand jury and whether the testimony could potentially shed important light on those matters. The matters under investigation by the grand jury include the most obvious: On January 6, 2021, the seat of the legislative branch of the federal government at the U.S. Capitol became a crime scene. Hundreds of rioters attacked federal government property and successfully delayed the scheduled certification of Electoral College votes cast for the president—an official proceeding of a Joint Session of Congress. *See Thompson*, 20 F.4th at 15–16. Such actions amounted to an unprecedented display of obstruction of an official government proceeding, which was merely the culmination of a long trail of federal felony and misdemeanor criminal violations. Those that unlawfully trespassed on the Capitol building, engaged in violent confrontations with law enforcement officers along the way, damaged property, and delayed the certification of the 46th president have, and continue to be, prosecuted in the interest of justice and the Constitution's promise of democratic elections.

The grand jury seeks information about specific activity leading up, and possibly contributing, to the criminal conduct executed on January 6, 2021. In prior proceedings, the government disclosed to the former president topics of investigative interest, █████████████

████████████████████████████████████████. [21] ████████████

---

[21]   █████████████████████████████████████████████████████████
██████████████████████████████████████

[REDACTED]

As to whether the testimonies of [REDACTED] could potentially shed important light on those matters, the answer is clearly affirmative. These [REDACTED] witnesses participated directly in presidential communications, enabling them to provide first-hand, eyewitness evidence to illuminate what the former president and his associates knew and said, if anything, about the relevant topics, making their testimony directly relevant, important, and essential to the grand jury's investigation. [REDACTED]

[REDACTED]

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████. Without a doubt, their first-hand accounts can provide insight into the grand jury's investigation by supplementing the grand jury's factual repository with primary evidence and revealing individuals', including government officials', intent behind potentially criminal actions, a required showing under the relevant statutes. *See, e.g.*, 18 U.S.C. § 1001(a)(2) (*knowingly* or *willfully* making a materially false, fictitious, or fraudulent statement or representation) (emphasis added).

Specifically, in demonstrating the requisite *mens rea* for the offenses under investigation, the government correctly states that "aspects of the meetings themselves, and the specific words spoken during them" are "central," and thus make it "critical to present to the grand jury the accounts of the persons who were in the room or on the phone when the conversations took place to learn what was discussed by and about relevant individuals in the privacy of the White House." ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ On this issue, the testimony of ████████████████

would be highly relevant, as already demonstrated by ████████████████████████

████████████████████████████████, after this Court granted the government's motion to

compel his testimony. ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

In addition, the nature of the evidence substantiating—or not—the former president's and

his associates' claims of election fraud are also probative of intent. In this regard, ████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████

     As yet another example of how the testimonies of ███████████ would be highly
relevant, they can further illuminate and corroborate the extent of the pressure brought on the
former vice president to delay or subvert the certification of the Electoral College votes for
president on January 6, 2022. ████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

     ██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████



In his defense, the former president stresses that any discussion he had about the certification of electoral votes involved his duty to ensure fair presidential elections.

The witnesses' highly relevant testimonies will assist the grand jury in assessing factual and *mens rea* requirements and may lead the grand jury to concur with the former president that no criminal wrongdoing occurred at all or to find probable cause of criminal misconduct attributable to one or more individuals whose conduct is examined. *See, e.g.*, *In re Sealed Case*, 121 F.2d at 761–62 (finding that the Office of Independent Counsel "demonstrated that it is likely the subpoenaed documents contain important evidence that is not available elsewhere" because the evidence was "reasonably [] relevant to the question of whether [the investigation's target] made false statements to the White House"). Regardless of the outcome, testimony pertaining to that key information more than fulfills the first prong of the standard of need test.[22]

Relevant to the test's second prong, no alternative to this evidence is available. Of the participants in the communications about which                   invoked various privileges, these    witnesses possess unique and inimitable evidence.

---

[22]     The former president's attempt to distinguish these facts from those in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997), falls flat.                          knowledge far surpasses merely "[former] President Trump's discussions              about the integrity of the 2020 presidential election."    . As described at length, their knowledge concerns efforts to obstruct an official proceeding of Congress and thus, as the Circuit in *In re Sealed Case* similarly held, provides highly important and relevant evidence to the grand jury's ongoing criminal investigation into the events on January 6, 2021.

██████████████████████████████████████████████████████

one-on-one conversations between the former president and ████ ███████████████, making

these ████ individuals the only witnesses to what the former president was told and said and

providing the government with no available alternative to obtain this evidence short of issuing a

subpoena to Trump. Moreover, in at least one known instance—████████████████████████

██████████████████████████████████████████████████████

████—actions of the witness himself are vital and irreplaceable evidence in the grand jury's

investigation.

Likewise, given the mostly conversational aspect of the communications in question,

individuals who participated in the meetings and calls or heard about them through participants,

*i.e.*, ████████████████, are the only way to shepherd in this evidence. In its exhaustive

search for witnesses, the government states that other executive officials with knowledge of this

information are likely to assert similar executive privileges.[23] The government thus far has not

discovered any written records of these conversations, leaving merely witnesses' recollections of

the events to serve as the "best" and only "evidence of the conversations available." *Sirica*, 487

F.2d at 718.

On these grounds, ████████████████ possess vital evidence for the grand jury, the

importance and unavailability of which outweigh the presidential communications privilege in

this case.

██ ████████████

██████████████████████████████████████████

██████████████████████████████████████████████

_____

[23] ████████████████████████████████████████████████████████
████████████████████







███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

## III. CONCLUSION

Based on the foregoing analysis, neither the presidential communications privilege nor

██████████████████████ bar eliciting testimony before the grand jury from █████████████

████████████████████████████████████████████████████, that

they have withheld.  Accordingly, the government's motion to compel testimony from these ██

grand jury witnesses is GRANTED.

Date:  November 19, 2022

*Beryl A. Howell*

BERYL A. HOWELL
Chief Judge

41