UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| IN RE GRAND JURY SUBPOENAS ▨ |

Case No. 22-gj-39 (BAH)

Chief Judge Beryl A. Howell

**UNDER SEAL**

▨

## MEMORANDUM OPINION

In ▨ a grand jury sitting in this District and investigating conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant temporary halt of the constitutionally mandated congressional certification of the Electoral College vote for the 2020 presidential election, issued a subpoena for testimony ▨

▨

▨

the former president filed a Motion to Compel, requesting an Order requiring ▨ to abide by the former president's instruction to invoke executive privilege ▨ on the latter's behalf. Having postponed ▨, thereby mooting the former president's motion, the government now moves to compel the witness's testimony because the grand jury's need for the important information overcomes the former president's privilege claims.

For the reasons explained below, the government's motion is granted.

## I. BACKGROUND

The grand jury's need for testimony from ▨ stems directly from his knowledge of events leading up to the certification of Electoral College votes by a Joint Session of Congress on January 6, 2021. ▨

1

██████████ Investigation into these events has been ongoing and described at length in two prior opinions relevant to compelling the grand jury testimony of ██ individuals: ████████

████████████████████████████████████████████████████████

████████████ *see* Memorandum Opinion, *In re Grand Jury Subpoenas*, No. 22-gj-25, ECF No. 18 at 2–12 (Sept. 28, 2022) ("Sept. 2022 Mem. Op."); ████████████

████████████████████████████████████████████████

████████████ *see* Memorandum Opinion, *In re Grand Jury Subpoenas*, No. 22-gj-33, ECF No. 13 at 1–14 (Nov. 19, 2022) ("Nov. 2022 Mem. Op."). The events leading up to and including January 6, 2021, have also been diligently recounted by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir. 2021), and described by witnesses under oath at public hearings before the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("House Select Committee" or "HSC"). These facts relevant to the instant witness are summarized below.

### A. 2020 Presidential Election and Other Events Leading to January 6, 2021, Joint Session of Congress

In the November 2020 presidential election, more than 81 million Americans, or 51.31% of the electorate, voted for Joseph Biden as president, overcoming approximately 74 million votes cast for Donald J. Trump. *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-content/documents/2020presgeresults.pdf. Nonetheless, the former president "refused to concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud and irregularities." *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Dec. 8,

2022)).  The former president and his allies filed numerous legal challenges to election results across the country, none of which proved successful.  *Id.*

In a last-ditch effort, individuals associated with the former president, the White House, and the former president's election campaign team attempted to influence the Electoral College vote scheduled for December 14, 2020, by urging the former president's supporters in closely contested states, in which candidate Biden won, to self-declare as duly appointed and qualified electors and cast votes for the former president on December 14 on fraudulent elector certificates.  *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 54:46–1:04:32, available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-attack-us-capitol (last accessed on Dec. 8, 2022) (describing the fake elector scheme).[1]  The former president's supporters took steps towards this desired end in



Arizona, Georgia, Michigan, Nevada, Wisconsin, New Mexico, and Pennsylvania—all states won by President Biden. *See id.* This effort failed in those seven states after all duly appointed electors cast votes on December 14, 2020, for President Biden. *See id.*

The former president and his operatives then shifted strategy, moving their focus from the Electoral College vote to the electoral vote certification. As constitutionally required by the Twelfth Amendment, the Electoral College votes cast on December 14, 2020, were to be certified by a Joint Session of Congress convened on January 6, 2021, in a proceeding presided over by the former vice president, who was to call for objections to the vote and, after all objections were resolved by the two congressional houses and the count was complete, announce the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3 (describing the congressional meeting of electors and vote certification); 3 U.S.C. § 15 (process describing the counting of electoral votes in Congress). The former president, "[i]n anticipation of that event, . . . had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that he claimed would be "'wild.'" *Thompson*, 20 F.4th at 17 (quoting Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).







[text redacted][8]

"Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse" and, during his "more than hour-long speech," repeated his claims of a "rigged" election. *Thompson*, 20 F.4th at 17–18. During that speech, the former president specifically urged the former vice president "to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18 (quoting Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32– 3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed Dec. 8, 2022) ("January 6th Rally Speech")). The former president also encouraged his supporters to go to the Capitol to "demand that Congress do the right thing" by refusing to certify the votes and to "fight like hell" or else "you're not going to have a country anymore." *Id.* (citing January 6th Rally Speech at 3:47:20– 3:47:42, 4:41:17–4:41:33). At that rally, the former president's attorney Rudolph Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral vote certification under the Electoral Count Act and called for "trial by combat." John Eastman and Rudolph Giuliani, January 6th Rally Speech at 2:22:07–2:22:10. Eastman added that "all we are demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures of

---

[8] [text redacted]

the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not." *Id.* at 2:26:54–2:27:12.

  As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed Congress's vote certification. *Thompson*, 20 F.4th at 18–19. Due to the catastrophic security breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* at 18. The former president did not request support for law enforcement members, many of whom were assigned to protect the former vice president. *Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC Hr'g Tr. (July 21, 2022)") at 34:48–36:02, available at https://www.c-span.org/video/?521771-1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Dec. 8, 2022).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

  As the events unfolded at the U.S. Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol and to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of

official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry, disorderly conduct, and other offenses on Capitol grounds)).  *See United States v. Bledsoe*, No. 21-204 (BAH), 2022 U.S. Dist. LEXIS 150326, at *9, *12 (D.D.C. Aug. 22, 2022).  Since then, hundreds of individuals have been investigated, charged, and convicted in this District for their criminal conduct in planning for and participating in the breach of the Capitol that resulted in disruption of the official proceeding of Congress to certify the results of the 2020 presidential election.

**B.      Instant Grand Jury Investigation**

████████████████████████████████████

██████████████████████ ██████████████

███████████████████████████████

████████████████████████████

████████████████████████

█████████████████████████████████

███████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████████████████████

████████████████████████

**C.      The Grand Jury Subpoena**

██████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████

The government then notified the White House Counsel's Office of the subpoena on

█████████████, and inquired whether President Biden would assert executive privilege ████

████████████████████ ████████████████ ██ ████████████████████████████

█████████████████████████████████████████████████ That

letter also listed ██████ topics to be addressed █████████████████████████████. ████

██ The White House Counsel's Office responded █████████████, that President Biden "will

not assert executive privilege" with respect to the witness's testimony ████████████████

███████████████████████████████████████████. President Biden

articulated that his waiver of executive privilege applied to the topics listed ██████████

██████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████

The government communicated the same request to the former president's counsel by

letter █████████████, and similarly included the ██████ anticipated topics ████████████

testimony. ████████ ████ ████████████████████

████████

During that period, ████████ attempted to ascertain whether the former president

would assert any privilege over aspects of his scheduled testimony. ████████████████

████████████████████████████ emailed ████████████ counsel to the former

president, notice of the subpoena and scheduled grand jury testimony, and sought "specific

written direction" on invocation of any privileges if the former president intended to assert them.

████████████████████████████████████████

████████████████████████████████████ ████

████████████████ responded later that day that, "well in advance" ████████████

scheduled testimony, he would provide "a letter that specifies [former] President Trump's

position on applicable privilege(s) with respect to ████████ appearance and testimony."

████

While awaiting instruction from the former president, ████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████ ████

Then, on ████████, ████████ followed up with ████ via email, having yet

to receive the promised letter, and repeated that, "[i]f President Trump is asserting any privileges

with respect to ████████ testimony, ████████ must commence an emergency action to

get a court ruling, before ████████ appearance, on the assertion of any privileges by

[former] President Trump." ████████████ ████ █ Minutes later, ████████ stated

his intention "to provide a clear directive from [former] President Donald J. Trump as to those

areas of questioning that would implicate executive privilege, and whether he asserts executive



privilege," and offered to call █████████ days later to discuss his testimony. ████████ The

following day, ██████████ replied that "all communications should be in writing," and that he

did not wish to risk being held in contempt for refusing to answer questions at the former

president's instruction without a court order barring his testimony as to privileged topics. ████

█

On ██████████ ██████████ again emailed ████████ having not received a

response to his last message, stating that he "will not rely on ██████████ ] say-so that privileges

apply here and be put in the middle of a privilege fight between DOJ and [former] President

Trump" at the risk of a contempt holding. ████████ He added that, "[a]bsent a court order

otherwise, I will testify on Friday," ██████████████████████████

responded by email that he would confer with the government on the "the procedure that would

be followed when a question is asked of ██████████ before the grand jury, the answer to

which is covered by [former] President Trump's assertion of executive privilege." ████████

██████████ same-day response reiterated that, in his opinion, "the proper course of action" is

a court order to preclude aspects of his testimony, but he added that, "if I get the prosecutor's

written assurances, I will abide by [former] President Trump's assertion." ████

Later that day, specifically, ████████████████████████████

██████████ the former president's counsel finally sent ██████████ a letter citing the presidential

communications privilege and instructing that he was "to the fullest extent permitted by law, . . .

not to provide testimony about, or reveal in any forum, privileged communications and

correspondence, ██████████████████████████████." ████████

████ ████ ██████████████████████████████ The

letter on behalf of the former president expressed the view that a president's "expectation of

confidentiality in [his] conversations and correspondence with those who advise and assist him"

13

is "protected under the United States Constitution" and so makes "[a]ll such presidential communications . . . presumptively privileged." ▮

Finally, on September 1, 2022, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the former president filed a Sealed Motion to Compel Witness ▮▮▮▮▮▮ to Invoke Privilege Before the Grand Jury, as Instructed by the Privilege Holder ("Resp't's Mot. Compel"), ▮▮▮▮ ▮▮ Therein, the former president requested an order directing ▮▮▮▮▮▮ "to properly invoke executive ▮▮▮▮▮▮▮▮▮▮▮▮ to all appropriate questions when complying with the federal grand jury subpoena for testimony," ▮▮▮▮ based on the former president's understanding that ▮▮▮▮▮▮ "intend[ed] to provide privileged testimony to the grand jury against the explicit directives of the privilege holder," *i.e.*, the former president, ▮▮▮ In response, the government postponed ▮▮▮▮▮▮ s grand jury testimony pending resolution of a motion to compel the testimony of ▮▮▮▮▮▮▮ over the former president's invocation of executive ▮▮▮▮▮▮▮▮▮, which, the parties agreed, concerned the same issues ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮ ("This Motion seeks to prevent improper disclosure of privileged information before it occurs. As there is already a motion pending on this issue, ▮▮▮▮▮▮ testimony can be delayed until the Court has made its ruling."); ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[9] Accordingly, the former president's motion was denied as moot.

---

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Min. Order (Sept. 2, 2022).

### D. Procedural History of Instant Motion



██████████████, the government moved to compel ████████████ to testify before the grand jury, listing as respondents the witness and the former president. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████, ██

██████████████████████████████████████████████████████████

████████████████████████████████ [10]

Simultaneous with these filings, the government requested permission for limited disclosure of the sealed motion to the witness and the former president subject to certain protections██████████████████████████████████████████

████████████████████████████████████████ The government's request for disclosure and a protective order was granted ████████████, pursuant to Local Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which together prohibit the public release of proceedings on a motion connected with a grand jury subpoena or matter before the grand jury unless ordered by the Court to "advance the important public and private

---

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████

[10] ██████████████████████████.

interests served by the grand jury secrecy requirement." Order Authorizing Limited Disclosure, Imposing Protection and Entering Briefing Schedule ("Protective Order") at 1, ECF No. 9.[11]

After conferral, the parties agreed to a briefing schedule consistent with the time requirements of Local Criminal Rule 47, giving the former president fourteen days to respond to the government's motion and the government seven days to submit a reply. Min. Order (Nov. 16, 2022); *see also* Resp. Order of the Court, ECF No. 10 (parties' recommended briefing schedule). Having submitted no request for oral argument on the motion, the parties rested on the arguments presented in their papers.[12] The government's motion is now ripe for review.

## II.    DISCUSSION

Given the former president's invocation of only the presidential communications privilege, that species of executive privilege is solely at issue here. *See In re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997) (describing the expansive doctrine of executive privilege). This privilege is first described generally and in the grand jury context before turning to the separate issues of whether the former president's invocation of the presidential communications privilege ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ operates to bar the compelled testimony of ▮▮▮▮▮▮▮.



Upon review, neither privilege claim succeeds because the significant need for the important evidence outweighs any interest in keeping information from the grand jury.

### A. Executive Privilege Generally

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id.* § 3, to name a few. Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff. As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d at 736.

The privilege granted to the Executive Branch has two distinct species, each derived from the same recognized need to protect Executive Branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege. *See id*. at 745. The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing *In re Sealed Case*, 121 F.3d at 745). It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved. *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S.

17

683, 705 (1974).  The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 885, that applies to (1) "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (internal citations omitted); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both parties confirmed, at issue in this motion is the presidential communications privilege. ███████████████████████████████████████████

███████████████████████████████████ That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege.  *Protect Democracy Project*, 10 F.4th at 885–86 (quoting *In re Sealed Case*, 121 F.2d at 745–46).  This distinction is important because of what the presidential communications privilege seeks to do.  "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."  *Nixon*, 418 U.S. at 708. Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."  *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020).  To ensure the rigorous honesty and due diligence required of presidential

policymaking, the presidential communications privilege thus serves as a shield to disclosure of those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted). That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process. *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886. Throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States." *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected from the mass of the people" and is thus subject to the "general provisions of the constitution" including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense). Consequently, any presumption of immunity conferred to a president "must be considered in light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at 710) (internal quotations omitted).

In practice, that qualified status means that the privilege does not apply to all forms of presidential communications with the same levels of deferential protection. Rather, three separate categories of presidential communications exist with varying levels of, or no, such protection. "Core communications," the most protected category, refers to communications regarding military, diplomacy, or sensitive national security secrets that are entitled to the most deference for privileged nondisclosure. *See GSA*, 433 U.S. at 446–47; *Nixon*, 418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, and expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This would certainly include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). In descending order of protection, next is the "generalized communications" category, which extends the privilege beyond the nation's most guarded information aforementioned to also cover communications relating to "the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711–12; *see also GSA*, 433 U.S. at 446–47. Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)); *cf. Nixon*, 418 U.S.

20

at 705.  Certainly, for instance, the president's lunch order is in the last category and is entitled to no privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties.

### B.    Presidential Communications Privilege Covers the Compelled Testimony at Issue

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel █████████████, and whether any level of privilege has been waived or inadequately asserted.  The government first posits that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021, and thus are not presidential communications at all.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[13]

The former president responds that the communications in question are presidential within the privilege's utmost protection because they involve "[s]afeguarding the integrity of federal elections through the faithful execution of the law," which, he claims, "is a fundamental duty of the President of the United States." ████████████████.  The former president then declares that "the integrity of a federal election is a matter of national security," such that "[w]hen a President speaks with his legal advisors about the transparency, legality, and integrity of a presidential election, those conversations must be full, frank, and candid[,]" thus amounting to a privilege from disclosure that is "essentially absolute." ████████████████████████

_____

[13] ██████████████████████████████

21

Each party is partially correct. To begin with the former president's position that the communications at issue involve matters of the utmost confidentiality, entitled to nearly "absolute" deference under the presidential communications privilege, he is incorrect. The communications at issue do not involve confidential military or diplomacy secrets. Nor does the former president claim that the communications concern classified information that would risk damage to national security upon unauthorized disclosure. Despite the former president's best argument that communications concerning the 2020 presidential election are national-security focused and thus any knowledge ██████████ has of these communications is privileged, this argument is unavailing for at least two reasons. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ ██ ██—were public and have no relation to secrets capable of causing damage to national security. Second, the government's topics of inquiry do not concern matters of election security. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ■

That said, the communications at issue implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need. *See infra* II.C and II.D.

---

[14] ████████████████████████████████████████████████

The government next contends that President Biden's decision not to invoke executive privilege over ▆▆▆▆ testimony requires the former president's assertion of privilege to "yield." ▆▆▆▆▆▆▆▆ [15] The former president highlights, however, that the Supreme Court recently and expressly held this question open, ▆▆▆▆▆▆ (citing *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Mem.)), and counters that if a presidential successor could waive the privileged communications of his predecessor, "it would thwart the primary purpose of the privilege, which is to ensure that the President can receive candid and honest advice in the performance of his constitutional duties," *id*. at 7 (citing *Nixon*, 418 U.S. at 705, and *GSA*, 443 U.S. at 448–49).

The government then proffers that the former president's privilege invocation was "too generalized and vague to qualify as an assertion" of the presidential-communications privilege. ▆▆▆▆▆▆▆▆ The former president retorts that his privilege invocation "was sufficiently clear and unambiguous such that ▆▆▆▆ could abide by its terms." ▆▆▆▆
▆▆▆▆

The Court need not enter either fray because the presumption that the communications are privileged quickly disposes of these disputes. Therefore, the issue addressed next is whether the government has sufficiently overcome the presidential communications privilege to warrant compelling the witness to testify fully before the grand jury. [17]

---

[15] ▆▆▆▆▆▆▆▆▆▆

[16] ▆▆▆▆▆▆▆▆▆▆

[17] 

23

C.      **Presidential Communications Privilege Does Not Bar Compelled Testimony**

Under the presumption that the compelled testimony at issue is protected from disclosure by the presidential communications privilege, the resolution of this motion falls squarely—and dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the Counsel to the President for records prepared in connection with an investigation of the former Secretary of Agriculture. In recounting the history and scope of the presidential communications privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential communications privilege yields to a demonstrated specific need in certain settings, such as congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744 (citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a sufficiently strong showing of litigating need")); and most relevant to the pending motion, criminal proceedings, *see id.* at 753–54 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at 717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this

case.")). The Circuit then posited "what type of showing of need" was necessary "to overcome the privilege" in the grand jury context. *Id.* at 753.

What resulted is the standard of need test, *id.* at 753–54, which both parties agree applies here, ████████████████████████████████ The test directs that "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." *In re Sealed Case*, 121 F.3d at 754; *see also id.* at 759–62 (application of the two-prong test). Under the first prong, "important evidence" is "directly relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not merely with the purpose of impeachment of witnesses or discussion of tangential issues. *Id.* at 754–55; *see also Nixon*, 418 U.S. at 701. The second prong requires a showing of "unavailability," that the evidence sought "should not be treated as just another source of information," but rather that efforts were made to obtain the information elsewhere and why those efforts were not fruitful. *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the public interest in protecting the executive's unique use of highly confidential information and need for candor and the public interest in disclosing material helpful and relevant to criminal investigations. In establishing the qualified nature of executive privilege, the Supreme Court in *Nixon* noted that "a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of a 'workable government' and gravely impair the role of the courts under Art. III" in a criminal proceeding. 418 U.S. at 707. Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in disclosure to a grand jury outweighed the public interest in protecting executive privilege. *Sirica*, 487 F.2d at 716–17. Given that those cases "clearly establish that the presidential

communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and enforcing the law." *In re Sealed Case*, 121 F.3d at 753.[18] In short, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is inherent in the two-prong test from *In re Sealed Case*.

### D.      Application of the Standard of Need Test

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for ▮▮▮▮▮▮▮ testimony involves examining both the matters under investigation by the grand jury and whether the testimony could potentially shed important light on those matters. The matters under investigation by the grand jury include the most obvious: On January 6, 2021, the seat of the legislative branch of the federal government at the U.S. Capitol became a crime scene. Hundreds of rioters attacked federal government property and successfully delayed the scheduled certification of Electoral College votes cast for the president—an official proceeding of a Joint Session of Congress. *See Thompson*, 20 F.4th at 15–16. Such actions amounted to an unprecedented display of obstruction of an official government proceeding, which was merely the culmination of a long trail of federal felony and misdemeanor criminal violations. Those that unlawfully trespassed on the Capitol building, engaged in violent confrontations with law enforcement along the way,

---

[18]      *Cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege).

damaged property, and delayed the certification of the 46th president have, and continue to be, prosecuted in the interest of justice and the Constitution's promise of democratic elections.

The grand jury seeks information about specific activity leading up, and possibly contributing, to the criminal conduct executed on January 6, 2021. The government disclosed to the former president topics of investigative interest. ████████████████████

████████████████████████████ ████ ████████████
████████████████████████████
████████████████████████████
██████████████████████████
████████████████████████████
████████████████████████████
██████████████████████████
████████████████████████
████████████████████████████
████████████████████████
████████████████████████████
████████████████████████████

The topics foreshadow the grand jury's ultimate decision whether individuals are criminally culpable for participating in the inception, organization, planning, and execution of the ultimate obstruction of the presidential vote certification in violation of 18 U.S.C. §§ 1512(c)(2) and (k), 1001(a)(2), and 371. *See Thompson*, 20 F.4th at 36 (linking the former president to the events on January 6, 2021); *see also Eastman v. Thompson*, 594 F. Supp. 3d at 1198–99.

As to whether ████████ testimony could shed important light on those matters, the answer is clearly affirmative. ████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ His testimony is, thus,

directly relevant, important, and essential to the grand jury's investigation. ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████

Specifically, in demonstrating the requisite *mens rea* for the offenses under investigation,

the government correctly states ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████ For example, what and when the former

president and his White House and campaign staff knew about election irregularities and whether

any such irregularities produced an incorrect presidential election result for President Biden, as

well as what the former president and his allies understood the law to be regarding the

congressional certification proceeding or the vice president's role in such is highly probative

context for assessing intent. On this issue, ██████████████████████████████████

█████████████████████████████████████████████████████

████████████████ ██████ ████████████████████████████████████ ███

██████ ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████ *See* Nov. 2022 Mem. Op. at 30–33.

████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████ ████) ████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Despite all this, Eastman stood before the large crowd of Trump supporters at the rally at

the Ellipse on January 6, 2021, ████████████████████████████████████

███████████████████████████████████████████

██████████

   ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

   As another example of the value █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

   ██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

In his defense, the former president stresses that any discussion he had about the certification of electoral votes involved his duty to ensure fair presidential elections ████████

████████   ████████████████████████████████████████████████████

will assist the grand jury in assessing factual and *mens rea* requirements and may lead the grand jury to concur with the former president that no criminal wrongdoing occurred at all or to find probable cause of criminal misconduct attributable to one or more individuals whose conduct is examined. *See, e.g.*, *In re Sealed Case*, 121 F.2d at 761–62 (finding that the Office of Independent Counsel "demonstrated that it is likely the subpoenaed documents contain important evidence that is not available elsewhere" because the evidence was "reasonably [] relevant to the question of whether [the investigation's target] made false statements to the White House"). Regardless of the outcome, testimony pertaining to that key information more than fulfills the first prong of the standard of need test.

Relevant to the test's second prong, no alternative to this evidence is available. On this point, the former president counters that ████████████ testimony is "duplicative of information already presented to the grand jury," ████████████████████████████████████████

████████████████████████████████████████████████████████████.

████████████████████████   ████████   That argument is unpersuasive.   ████████████████

████████████████████████████████████████████ he possesses unique and

inimitable evidence. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

providing the government with no available alternative to obtain this evidence short of issuing a

subpoena to Trump.

Likewise, given the mostly conversational aspect of the communications in question,

individuals who participated in the meetings and calls or heard about them through participants,

█████████████████ are the only way to shepherd in this evidence. In its exhaustive search for

witnesses, the government states that other executive officials with knowledge of this

information are likely to assert similar executive privileges.[19] The government thus far has not

discovered any written records of these conversations, leaving merely witnesses' recollections of

the events to serve as the "best" and only "evidence of the conversations available." *Sirica*, 487

F.2d at 718. Additionally, although multiple witnesses may provide testimony about the same

meeting or conversation, as the government explains, ████████████████, what these

witnesses recall may differ in detail. Even overlapping testimony as to certain aspects of these

conversations corroborates the overall communication the grand jury seeks to consider, ensuring

that the investigation is of the utmost accuracy and completeness.

---

[19] ████████████████████████████████████████████████████
████████████████████████████████████████████

On these grounds, ███████████ possesses vital evidence for the grand jury, the importance and unavailability of which outweigh the presidential communications privilege in this case.

███   ████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██   ████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████



████████████████████████████████████████████████ ███████████████

████████████████████████████████████████ ██████████

████████████████████████████ ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

## III. CONCLUSION

Based on the foregoing analysis, neither the presidential communications privilege nor the ████████████████ bar eliciting testimony before the grand jury from ████████████ ████████████████████████████. Accordingly, the government's motion to compel testimony from this grand jury witness is GRANTED.

Date:  December 9, 2022

_Beryl A. Howell_
BERYL A. HOWELL
Chief Judge