## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE GRAND JURY SUBPOENAS

Case No. 23-gj-12 (BAH)

Chief Judge Beryl A. Howell

**UNDER SEAL**

███████████████████████████

### MEMORANDUM OPINION

From ██████████████████, a grand jury sitting in this District issued subpoenas for

testimony and documents to ██████████████████████████

█████████████████████████████████████████████████

██████████████████████, relevant to an investigation into

conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant

temporary halt of the constitutionally mandated congressional certification of the Electoral

College vote for the 2020 presidential election. ██████████████████ those

witnesses appeared separately either before the grand jury or submitted to interviews with the

government and declined to respond to certain questions by invoking executive privilege at the

direction of the former president. The government now moves to compel the witnesses' full

compliance with the subpoenas because the grand jury's need for the important information

overcomes the former president's privilege claim.

For the reasons explained below, the government's motion is granted.

## I.     BACKGROUND

The ████ individuals subject to the instant motion ("the Witnesses") ████████████

█████████████████████████████████████████████



▋▋▋▋▋▋▋▋▋▋, the relevant period of the government's investigation. Their

titles during that relevant period are as follows:

The grand jury's need for testimony and documents from the Witnesses stems directly

from their knowledge of events leading up to the certification of Electoral College votes by a

Joint Session of Congress on January 6, 2021. ▋▋▋▋▋▋ Investigation into these

events has been ongoing and described at length in three prior opinions relevant to compelling

the grand jury testimony of ▋ individuals: ▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋, *see In re*

*Grand Jury Subpoenas*, No. 22-gj-25, Memorandum Opinion (▋▋▋▋) at 2–12, ECF No.

18 ("Sept. 2022 Mem. Op."); ███████████████████████████
███████████████████████████████, *see In re Grand Jury Subpoenas*,
No. 22-gj-33, Memorandum Opinion (██████) at 1–14, ECF No. 13 ("Nov. 2022 Mem.
Op."); and ███████████████████████ *see In re Grand
Jury Subpoena*, No. 22-gj-39, Memorandum Opinion (██████) at 1–16, ECF No. 15 ("Dec.
2022 Mem. Op.").  The events leading up to and including January 6, 2021, have also been
diligently recounted by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir.
2021), and described by witnesses under oath at public hearings before the U.S. House of
Representatives Select Committee to Investigate the January 6th Attack on the United States
Capitol ("House Select Committee" or "HSC").  Those facts relevant to the ████ Witnesses are
summarized below.

A.  **2020 Presidential Election and Other Events Leading to January 6, 2021,
Joint Session of Congress**

In the November 2020 presidential election, more than 81 million Americans, or 51.31%
of the electorate, voted for Joseph Biden as president, overcoming approximately 74 million
votes cast for Donald J. Trump.  *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL
GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-
content/documents/2020presgeresults.pdf.  Nonetheless, the former president "refused to
concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud
and irregularities."  *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on
2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-
span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Mar.
15, 2023)).  Those theories of voter fraud and election irregularities circulated by the former
president and his team included, among others, foreign interference in the election, tampering of
vote counts by Chinese infiltrators using Nest home thermostats, use of Italian satellites to alter

voting equipment, and inconsistencies in Dominion and Smartmatic voting machines.[1] Intelligence agencies repeatedly rejected those claims, some of which can only be described politely as far-fetched, for lack of evidence.  The former president and his allies also filed numerous legal challenges to election results across the country, none of which proved successful.  *Id.*

In a last-ditch effort, individuals associated with the former president, the White House, and the former president's election campaign team attempted to influence the Electoral College vote scheduled for December 14, 2020, by urging the former president's supporters in closely contested states, in which candidate Biden won, to self-declare as duly appointed and qualified electors and cast votes for the former president on December 14 on fraudulent elector certificates.  *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 54:46–1:04:32, available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-attack-us-capitol (last accessed on Mar. 14, 2023) (describing the fake elector scheme).[2]  The former president's supporters took steps towards this desired end



in Arizona, Georgia, Michigan, Nevada, Wisconsin, New Mexico, and Pennsylvania—all seven states won by President Biden. *See id.* This effort failed in those seven states after all duly appointed electors cast votes on December 14, 2020, for President Biden. *See id.*[3]

The former president and his operatives then shifted strategy, moving their focus from the Electoral College vote to the electoral vote certification. As constitutionally required by the Twelfth Amendment, the Electoral College votes cast on December 14, 2020, were to be certified by a Joint Session of Congress convened on January 6, 2021, in a proceeding presided



over by the former vice president, who was to call for objections to the vote and, after all objections were resolved by the two congressional houses and the count was complete, announce the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3 (describing the congressional meeting of electors and vote certification); 3 U.S.C. § 15 (process describing the counting of electoral votes in Congress). The former president, "[i]n anticipation of that event, . . . had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that he claimed would be "'wild.'" *Thompson*, 20 F.4th at 17 (quoting Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).

[4]



_____

[7] 

[8] 

[9]



████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

██████████████████

"Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse" and, during his "more than hour-long speech," repeated his claims of a "rigged" election. *Thompson*, 20 F.4th at 17–18. During that speech, the former president specifically urged the former vice president "to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18 (quoting Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32– 3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed on Mar. 15, 2023) ("January 6th Rally Speech")). The former president also encouraged his supporters to go to the Capitol to "demand that Congress do the right thing" by refusing to certify the votes and to "fight like hell" or else "you're not going to have a country anymore." *Id.* (citing January 6th Rally Speech at 3:47:20– 3:47:42, 4:41:17–4:41:33). At that rally, Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral vote certification under the Electoral Count Act and called for "trial by combat." John Eastman and Rudolph Giuliani, January 6th Rally Speech at 2:22:07–2:22:10. Eastman added that "all we are demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures of the state look into this so we get to the bottom

---

[12] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

of it and the American people know whether we have control of the direction of our government or not." *Id.* at 2:26:54–2:27:12.

As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed Congress's vote certification. *Thompson*, 20 F.4th at 18–19. Due to the catastrophic security breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* at 18. The House Select Committee concluded that the former president did not request support for law enforcement members, many of whom were assigned to protect the former vice president. *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC Hr'g Tr. (July 21, 2022)") at 34:48–36:02, available at https://www.c-span.org/video/?521771-1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Mar. 15, 2023). ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████



As the events unfolded at the Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol and to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry,

---



disorderly conduct, and other offenses on Capitol grounds)). *See United States v. Bledsoe*, No. 21-204 (BAH), 2022 WL 3594628, at *4 (D.D.C. Aug. 22, 2022). Since then, hundreds of individuals have been investigated, charged, and convicted in this District for their criminal conduct in planning for and participating in the breach of the Capitol that resulted in disruption of the official proceeding of Congress to certify the results of the 2020 presidential election.

**B. Instant Grand Jury Investigation**



**C. Procedural History**

seeking their testimony related to "possible violations of federal criminal laws." The subpoenas served on

[REDACTED] The Witnesses were scheduled to testify [REDACTED].

Anticipating the former president's privilege assertions over the Witnesses' subpoena compliance, [REDACTED], the government sought, with the consent of the Witnesses' counsel, orders from this Court allowing the government to discuss the subpoenas with counsel for the incumbent and former presidents. *See In re Grand Jury Subpoena*, No. 22-gj-45, [REDACTED]; *In re Grand Jury Subpoena*, No. 22-gj-46, [REDACTED]; *In re Grand Jury Subpoenas*, No. 23-gj-2, [REDACTED]; *In re Grand Jury Subpoena*, No. 23-gj-9, [REDACTED] Such discussions would enable the government to "ascertain whether any potential privilege holder – including the incumbent and former Presidents – intends to instruct the witnesses not to testify in the grand jury based on an assertion of executive privilege[,]" [REDACTED], and thereby remove "the onus of these consultations" from the Witnesses, [REDACTED]

**[REDACTED]**

The government's motions were granted. *See In re Grand Jury Subpoena*, No. 22-gj-45, Order Authorizing Disclosure of Grand Jury Material ( **[REDACTED]** ) **[REDACTED]** , ECF No. 7; *In re Grand Jury Subpoena*, No. 22-gj-46, Order Authorizing Disclosure of Grand Jury Material ( **[REDACTED]** **[REDACTED]** , ECF No. 4; *In re Grand Jury Subpoenas*, No. 23-gj-2, Order Authorizing Disclosure of Grand Jury Material **[REDACTED]** **[REDACTED]** , ECF No. 2; *In re Grand Jury Subpoena*, No. 23-gj-9, Order Authorizing Disclosure of Grand Jury Material **[REDACTED]** , ECF No. 2.

Accordingly, on **[REDACTED]** , the government notified the White House Counsel's Office of the Witnesses' subpoenas and inquired whether President Biden would assert executive privilege to bar the Witnesses' testimonies. **[REDACTED]** **[REDACTED]** On **[REDACTED]** , the White House Counsel's Office responded that President Biden "will not assert executive privilege" with respect to the Witnesses' testimonies. **[REDACTED]** **[REDACTED]** The White House Counsel's letters elaborated that "President Biden recognizes the importance of candid advice in the discharge of a President's constitutional responsibilities and believes that, in appropriate cases, executive privilege should be asserted to protect either current or former White House senior staff from having to testify about conversations concerning the President's exercise of his duties." **[REDACTED]** **[REDACTED]** ). That said, given "the extraordinary events surrounding" the January 6 attack on the Capitol and the "unique circumstances" presented by such an unprecedented event, President Biden determined "that an assertion of executive privilege is not in the public interest with respect to the efforts to thwart

the orderly transition of power under our Constitution." ▮ The President articulated that his waiver of executive privilege applied to "events within the White House on or about January 6, 2021; efforts to use the Department of Justice to advance a false narrative that the 2020 election was tainted by widespread fraud; and other similar efforts to alter valid 2020 election results or obstruct the transfer of power." ▮▮▮

▮▮▮.

The government communicated the same request to the former president's counsel by letters ▮▮▮ ▮▮▮ In each letter, the government identified ▮▮▮ topics about which the Witnesses were to be questioned before the grand jury. ▮▮ On ▮▮▮, the former president's counsel sent letters directly to counsel for the Witnesses instructing that they were "to the fullest extent permitted by law, . . . not to provide testimony about, or reveal in any forum, communications and correspondence" with him or his advisors, "including those that are privileged" because of each Witness's role in the White House or the Executive Branch. ▮▮▮ ▮▮▮ These letters express the view that "there is an



expectation of confidentiality in a President's conversations and correspondence with those who advise and assist him," which "confidentiality is protected under the United States Constitution and all such presidential communications are presumptively privileged." ████████████

The letters clarify that the former president specifically invokes the presidential communications privilege. ██



██████████████████████. During those testimonies and interviews, each Witness declined to answer multiple questions, citing executive privilege, consistent with their understanding of the former president's instruction. ██████████

---

16 ██████████████████████████████

17 ██████████████████████



On ▮▮▮▮▮▮▮▮▮▮, the government moved to compel the Witnesses to comply fully with the grand jury subpoenas, listing the former president as the respondent. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ ▮

Simultaneous with these filings, the government requested permission for limited disclosure of the sealed motion to the former president, subject to certain protections. ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The government also requested that the Witnesses only be informed in this ongoing litigation without revealing any filings in this matter to prevent each Witness from identifying others, which would violate grand jury secrecy required by Federal Rule of Criminal Procedure 6(e). ▮▮▮. The government's request for a disclosure and protective order was granted on ▮▮▮▮▮▮▮▮, pursuant to Local Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which rules together prohibit the public release of proceedings on a motion connected with a grand jury subpoena or matter before the grand jury unless ordered by the Court to "advance the important public and private interests served by the

---

18 ▮▮▮▮▮▮▮▮▮▮▮▮

grand jury secrecy requirement." Order Authorizing Limited Disclosure, Imposing Protection and Entering Briefing Schedule ("Protective Order") at 1, ECF No. 3.[19]

The Protective Order also set a briefing schedule consistent with the time requirements of Local Criminal Rule 47(b), giving the former president fourteen days to respond to the government's motion and the government seven days to submit a reply. *Id.* ¶ 3.[20]  The government's motion is now ripe for review.

## II. DISCUSSION

Given the former president's invocation of only the presidential communications privilege, that species of executive privilege is solely at issue here. *See In re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997) (describing the expansive doctrine of executive privilege). This privilege is first described generally and in the grand jury context before turning to the separate issues of whether the former president's invocation of the presidential communications privilege operates to bar the Witnesses' compliance with the subpoenas.  Upon review, the former president's privilege claim fails because the significant need for the important evidence outweighs any interest in keeping information from the grand jury.



19

20

### A.    Executive Privilege Generally

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id.* § 3, to name a few.  Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff.  As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d at 736.

The privilege granted to the Executive Branch has two distinct species, each derived from the same recognized need to protect Executive Branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege. *See id.* at 745.  The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing *In re Sealed Case*, 121 F.3d at 745).  It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved. *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S. 683, 705 (1974).  The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 885, that applies to (1) "communications

directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (internal citations omitted); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities . . . of his office . . . and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both parties confirm, at issue in this motion is the presidential communications privilege. ██████████████████. That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege. *Protect Democracy Project*, 10 F.4th at 885–86 (quoting *In re Sealed Case*, 121 F.2d at 745–46). This distinction is important because of what the presidential communications privilege seeks to do. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020). To ensure the rigorous honesty and due diligence required of presidential policymaking, the presidential communications privilege thus serves as a shield to disclosure of those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, . . . in order to effectively and faithfully carry out his Article II

duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted). That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process. *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886. First, executive privilege, like attorney-client privilege, is subject to waiver by disclosure, although the "high bar" for such waiver "should not be lightly inferred" and only waives the privilege "for the document or information specifically released, not for related materials." *Id.* at 890 (quoting *In re Sealed Case*, 121 F.3d at 741). Second, throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States." *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected from the mass of the people" and is thus subject to the "general provisions of the constitution" including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense). Consequently, any presumption of immunity conferred to a president "must be considered in light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at 710) (internal quotations omitted).

In practice, that qualified status means that the privilege does not apply to all forms of presidential communications with the same levels of deferential protection.  Rather, three separate categories of presidential communications exist with varying levels of, or no, such protection.  "Core communications," the most protected category, refers to communications regarding military, diplomacy, or sensitive national security secrets that are entitled to the most deference for privileged nondisclosure.  *See GSA*, 433 U.S. at 446–47; *Nixon*, 418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, and expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need").  This would certainly include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009).  In descending order of protection, next is the "generalized communications" category, which extends the privilege beyond the nation's most guarded information aforementioned to also cover communications relating to "the effective discharge of a President's powers."  *Nixon*, 418 U.S. at 711; *see also GSA*, 433 U.S. at 446–47.  Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties.  *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)); *cf. Nixon*, 418 U.S.

at 705.  Certainly, for instance, the president's lunch order is in the last category and is entitled to no privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties.

### B.   Presidential Communications Privilege Covers the Compelled Testimony at Issue

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel from the Witnesses, and whether any level of privilege has been waived or inadequately asserted.  The government first posits that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021, and thus are not presidential communications at all.  ██████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████

The former president responds that "Communications And Documents Implicating Executive Privilege On Matters Of National Security Demand Absolute Protection From Disclosure."  ████████████  He adds that "the executive privilege may transform into an '*absolute, unqualified* Presidential privilege of immunity from judicial process[,]'" and in such instances, "this Court must *at the very least* require *the most compelling* showing of need" when reviewing the instant motion for testimony and documents.  ████████ (quoting *Nixon*, 418 U.S. at 706) (emphasis in original).  Focusing on the roles certain Executive Branch officials played in advising him on national security issues during his presidency, ████████, the former president contends that "the testimony of ████████████████████████████████████████ —

---

[21] ████████████████████████████████



must be presumed to implicate the most sensitive issues protected at the core of executive privilege[,]" ████ Likewise, the former president views the ████ Witnesses—

with President Trump." ████

At the outset, the former president's position that the communications at issue involve matters of the utmost confidentiality, entitled to nearly "absolute" protection under the presidential communications privilege is incorrect. The communications and documents at issue do not involve confidential military or diplomatic secrets, as mentioned in *Nixon*, 418 U.S. at 706. Nor does the former president claim that the communications and documents concern classified information that would risk damage to national security upon unauthorized disclosure. To say that discussions with the Witnesses involved national security secrets is inaccurate. None of the communications the government seeks involves national security or classified—top secret, secret, or confidential—information per the designation of such according to Executive Order No. 13,526, the latest, and thus authoritative, order detailing a uniform system for classifying, protecting, and disclosing national security information. *See* 75 Fed. Reg. 707 (Dec. 29, 2009). The former president provides no evidence beyond bald allegations that the communications at issue involved election security rising to the level of risks to this nation's security.

The former president's best argument is that communications and documents concerning, what he identifies as, "(1) the integrity of the national election; (2) providing National Guard support to avoid violence in Washington, D.C., on January 6, 2021; and (3) the content of President Trump's public statements, in speech and on social media platforms, including on January 6, 2021, urging peace" are national-security focused and thus any knowledge the

Witnesses have regarding these topics is privileged. ████████████████ This argument is unavailing for at least three reasons, however. First, the events on January 6, 2021—including, among other things, the rally that day, its planning and organization, law enforcement's response, Congress's conduct in an official proceeding, and the former president's public statements and social media posts on January 6, 2021, ████████████████████████████ ████████████████████████████████—were all matters either highly public or generating public debate and scrutiny, far different from classified matters kept confidential due to the risk that disclosure could cause damage to national security. The former president acknowledges this: He mentions the three aforementioned "national security matters under consideration by [him] and his top advisors during the timeframe covered by the subpoenas" and then cites a *published* book that he describes as "detailing President Trump's suggestion to his Acting Secretary of Defense to have significant National Guard resources ready to deploy to ensure the safety and security of the Capitol on January 6, 2021, which went unheeded by Congressional leadership." ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████. No topic of potential grand jury inquiry demands "absolute" protection barring testimony when the same subject matter has been disclosed in a book as well as in public speeches and posted commentary on Twitter and Facebook.

Second, the government does not seek to investigate matters of election security or integrity implicating national security secrets. Rather, under investigation are, *inter alia*,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████.[22]  Those topics do not involve secrets nor classified information such that revelation within the confines of the grand jury would cause harm to the country.[23]

Finally, the fact that certain of the Witnesses held positions in the Trump presidential administration that involved national security does not automatically deem communications with those individuals as implicating national security secrets.  As explained previously, the presidential communications privilege is not a blanket protection over all communications with the president, *see supra* Section II.A (explaining the qualified nature of the privilege), and the scope of its protection certainly does not rise and fall on an individual's job title or nexus to the president.  The content of the communications dictates the level of protection they deserve.  For instance, the president may have regular meetings with the Director of the CIA about foreign hostilities or unsecure diplomatic relations—topics sure to demand enhanced protection—but if communications instead involved the president's lunch order or the CIA Director's style of clothing, the presidential communications privilege does not apply to those conversations.  Therefore, the former president may certainly acknowledge that he had conversations with the Witnesses about national security generally and even national security secrets, but the government's submissions thoroughly detail that the communications and documents sought do not involve any founded or reasonable risks to this nation's safety and security, let alone those involving national security secrets, and so, near "absolute" protection is not appropriate here.

---

[22] ████████████████████████████████████████████████████

[23] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

That said, the communications at issue implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need. *See infra* II.C and II.D.

The government next contends that President Biden's decision not to invoke executive privilege over the Witnesses' subpoena compliance requires the former president's assertion of privilege to "yield." ██████████████████████████████ The former president highlights correctly, however, that the Supreme Court recently and expressly held this question open ████████████ (citing *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Mem.)), and counters that if a presidential successor could waive the privileged communications of his predecessor, "the presidential communications privilege would be destroyed," █

The government then proffers that the former president's privilege invocation was "too generalized and vague to qualify as an assertion" of the presidential-communications privilege. ██████████████████████████ The former president retorts that his privilege invocation was made in "clear and unambiguous terms." ██████████

The Court need not enter either fray because the presumption that the communications are privileged quickly disposes of these disputes. Therefore, the question addressed next is whether the government has sufficiently overcome the presidential communications privilege to warrant compelling the Witnesses to testify fully before the grand jury. █

---

24 ███████████████████████

25 ███████████████████████

26 ████████████████████████████████████████

28

C. **Presidential Communications Privilege Does Not Bar Compelled Testimony**

Under the presumption that the compelled testimony at issue is protected from disclosure by the presidential communications privilege, the resolution of this motion falls squarely—and dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the Counsel to the President for records prepared in connection with an investigation of the former Secretary of Agriculture. In recounting the history and scope of the presidential communications privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential communications privilege yields to a demonstrated specific need in certain settings, such as congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744 (citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a sufficiently strong showing of litigating need")); and most relevant to the pending motion, criminal proceedings, *see id.* at 753–54 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at 717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail

in the face of the uniquely powerful showing made by the Special Prosecutor in this

case.")).  The Circuit then posited "what type of showing of need" was necessary "to overcome

the privilege" in the grand jury context.  *Id*. at 753.

What resulted is the standard of need test, *id.* at 753–54, which both the government and

former president agree applies here, ███████████████.  The test directs

that "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that

each discrete group of the subpoenaed materials likely contains important evidence; and second,

that this evidence is not available with due diligence elsewhere."  *In re Sealed Case*, 121 F.3d at

754; *see also id.* at 759–62 (application of the two-prong test).  Under the first prong, "important

evidence" is "directly relevant to issues that are expected to be central to the trial" and is of clear

evidentiary value, not merely with the purpose of impeachment of witnesses or discussion of

tangential issues.  *Id.* at 754–55; *see also Nixon*, 418 U.S. at 701.  The second prong requires a

showing of "unavailability," that the evidence sought "should not be treated as just another

source of information," but rather that efforts were made to obtain the information elsewhere and

why those efforts were not fruitful.  *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the

public interest in protecting the executive's unique use of highly confidential information and

need for candor and the public interest in disclosing material helpful and relevant to criminal

investigations.  In establishing the qualified nature of executive privilege, the Supreme Court in

*Nixon* noted that "a generalized claim of the public interest in confidentiality of nonmilitary and

nondiplomatic discussions would upset the constitutional balance of a 'workable government'

and gravely impair the role of the courts under Art. III" in a criminal proceeding.  418 U.S. at

707.  Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in

disclosure to a grand jury outweighed the public interest in protecting executive privilege.

*Sirica*, 487 F.2d at 716–17.  Given that those cases "clearly establish that the presidential communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and enforcing the law." *In re Sealed Case*, 121 F.3d at 753.[27]  In short, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is inherent in the two-prong test from *In re Sealed Case*.

### D.  Application of the Standard of Need Test

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for the Witnesses' testimonies involves examining both the matters under investigation by the grand jury and whether compliance with the subpoenas could potentially shed important light on those matters.  The matters under investigation by the grand jury include the most obvious:  On January 6, 2021, the seat of the legislative branch of the federal government at the U.S. Capitol became a crime scene.  Hundreds of rioters attacked federal government property and successfully delayed the scheduled certification of Electoral College votes cast for the president—an official proceeding of a Joint Session of Congress.  *See Thompson*, 20 F.4th at 15–16.  Such actions amounted to an unprecedented display of obstruction of an official government proceeding, which was merely the culmination of a long trail of federal felony and misdemeanor criminal violations.  Those that

---

[27]      *Cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege).

unlawfully trespassed on the Capitol building, engaged in violent confrontations with law enforcement along the way, damaged property, and delayed the certification of the 46th President have, and continue to be, prosecuted in this District to vindicate the nation's fundamental interest in the peaceful transition of power and the Constitution's promise of democratic elections.

The grand jury seeks information about specific activity leading up, and possibly contributing, to the criminal conduct that occurred on January 6, 2021. The government disclosed to the former president topics of investigative interest,



### 1. Witnesses' Testimonies and Subpoenaed Materials Likely Contain Important and Directly Relevant Evidence

As to whether the Witnesses' compliance could shed important light on those matters, the answer is clearly affirmative. Each Witness participated directly in presidential communications, enabling them to provide first-hand, eyewitness evidence to illuminate what the former president and his associates knew and said, if anything, about the relevant topics. Their testimonies are, thus, directly relevant, important, and essential to the grand jury's investigation.

Even more specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

████ Thus, the Witnesses undoubtedly will provide first-hand accounts that may provide insight into the investigation by supplementing the grand jury's factual repository with primary evidence and revealing individuals', including government officials', intent behind potentially criminal actions, a required showing under the relevant statutes. *See, e.g.*, 18 U.S.C. § 1001(a)(2) (*knowingly* or *willfully* making a materially false, fictitious, or fraudulent statement or representation) (emphasis added).

Specifically, in demonstrating the requisite *mens rea* for the offenses under investigation, the government correctly states that "evidence relating to the specific content of meetings and conversations involving the subjects of the investigation about the election certification and efforts to obstruct, impede, or influence it" are "[c]ritical" to determining whether any investigative target acted with the requisite intent—willfully, knowingly, or corruptly—to commit a criminal act. ████████████████ ███████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████ On this issue, the Witnesses' testimonies would be highly relevant,

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████ after this Court

granted the government's motion to compel these witnesses' testimonies.  The value of those

witnesses' testimonies were described at length in this Court's November 2022 opinion, ████

████ and December 2022 opinion, ████████ granting the government's motion to compel the

grand jury testimonies of ████████████████████. *See* Nov. 2022 Mem. Op. at 30–

33 ██████████████████; Dec. 2022 Mem. Op. at 29–33 ████████████████.

████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████

In his defense, the former president stresses that any discussion he had about the certification of electoral votes involved his duty to ensure fair presidential elections. ████ ██████████████████████ Like the testimonies of ████████████████████ ████████, the Witnesses' highly relevant testimonies will assist the grand jury in assessing factual and *mens rea* requirements and may lead the grand jury to concur with the former president that no criminal wrongdoing occurred at all or to find probable cause of criminal misconduct attributable to one or more individuals whose conduct is examined. *See, e.g.*, *In re Sealed Case*, 121 F.2d at 761–62 (finding that the Office of Independent Counsel "demonstrated that it is likely the subpoenaed documents contain important evidence that is not available elsewhere" because the evidence was "reasonably [] relevant to the question of whether [the investigation's target] made false statements to the White House"). Regardless of the outcome,

testimony pertaining to that key information more than fulfills the first prong of the standard of need test.

The former president's remaining counterargument falls flat. He states that the government's motion is nothing more than "specious and conclusory allegations" relying on an "empty factual record" and "boilerplate and conclusory statements of law, devoid of any particularized facts regarding the communications involved or the documents in the custody and control" of the Witnesses. ███████████. He adds that the government's lack of factual support does not give this Court the occasion "to abrogate the key national security interests that protect" presidential communications. ██████ ████████████

████████████████████████████████
██████████████████████████████████
███████████████████████████████
█████████████████████████
█████████████████████████████
████████████████████████████
███████████████████████████
████████████████████████████
██████████████████████████████
███████████████████████████
█████████████████████████████
████████████████████████████
██████████████████████████
████████████████████████████



**2. No Available Alternative to Witnesses' Testimonies**



Relevant to the test's second prong, no alternative to this evidence is available. On this point, the former president counters that the government has already heard the testimony of ██ witnesses, namely, ████████████████████████████ so granting the government's motion would permit "cast[ing] an impermissibly wide net to capture ██ ████████████████████████████ Although the argument is summarily asserted, the former president argues in essence that the government has presented the testimonies of ██ witnesses regarding the ████ topics of interest to the grand jury and so the testimonies of the instant Witnesses regarding those same topics is duplicative and thus available with due diligence elsewhere. ████████████; *see also In re Sealed Case*, 121 F.3d at 754. That argument is unpersuasive. As discussed previously, the Witnesses possess unique and inimitable evidence that involved numerous private, one-on-one conversations with the former president. *See supra* pages 31–33; *see, e.g.,* ████████████████████

████████████████████████; ████████████████

████████████████████████████████

████████████████████████████

████████████████████████

████████████████████████████

████████████████████████

████████████████████████████;

████ ██████████████████████████

████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

Likewise, given the mostly conversational aspect of the communications in question, individuals who participated in the meetings and calls or heard about them through participants, *i.e.*, the Witnesses, are the only way to shepherd in this evidence. In its exhaustive search for witnesses, the government has identified these individuals because they are necessary to corroborate events about which other witnesses may have already testified. Although multiple witnesses may provide testimony about the same meeting or conversation, as the government explains, what these Witnesses recall may differ in detail. Even overlapping testimony as to certain aspects of these conversations corroborates the overall communication the grand jury seeks to consider, ensuring that the investigation is of the utmost accuracy and completeness. Finally, the government thus far has not discovered any written records of these conversations, leaving merely witnesses' recollections of the events to serve as the "best" and only "evidence of the conversations available." *Sirica*, 487 F.2d at 718.

***

On these grounds, the Witnesses possess vital evidence for the grand jury, the importance and unavailability of which outweigh the presidential communications privilege in this case.

## III.    CONCLUSION

Based on the foregoing analysis, the presidential communications privilege does not bar eliciting testimony before and production of documents to the grand jury from ███████████

███████████████████████████████████████████

▮▮▮▮▮▮▮▮    Accordingly, the government's motion to compel compliance with the grand

jury subpoenas is GRANTED.

        Date:  March 15, 2023

                                    _____
                                    BERYL A. HOWELL
                                    Chief Judge