UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE GRAND JURY SUBPOENA** ███████████ | Case No. 23-gj-13 (JEB) <br><br> <u>Under Seal</u> <br><br> ████████████████████ |

MEMORANDUM OPINION

In the wake of the January 6, 2021, attack on the U.S. Capitol, a Special Counsel was appointed and a grand jury was empaneled to investigate potential interference with the transfer of power following the 2020 Presidential election. That grand jury has issued a subpoena for testimony to ███████████████████████. Anticipating that the former President Donald J. Trump would assert executive privilege to prevent ████ from testifying, the Government moved to compel compliance with the subpoena. Indeed, Trump has responded with an Opposition to the Motion to Compel that invokes the presidential-communications privilege. Because the Government has shown that the grand jury's need for information largely overcomes the former President's privilege claims, the Court will grant the lion's share of the Motion to Compel. ████████████████████████████████████████████████████████████

I.  **Background**

As former Chief Judge Beryl Howell has recounted the factual background of the events leading up to January 6, 2021, and the related grand-jury investigation in depth in her prior Opinions, see <u>In re Grand Jury Subpoenas</u>, No. 23-gj-12, ECF No. 11 ██████████████; <u>In re Grand Jury Subpoenas</u>, No. 22-gj-39, ECF No. 15 ██████████████; <u>In re Grand Jury Subpoenas</u>, No. 22-gj-33, ECF No. 13 ██████████████; <u>In re Grand Jury</u>

1

Subpoenas, No. 22-gj-25, ECF No. 18 ███████████, the Court will confine this brief background section to the facts relevant to the instant subpoena and the former President's Motion.

### A. Grand-Jury Investigation

On January 6, 2021, a Joint Session of Congress convened to certify the results of the Electoral College vote, which would confirm then-President-Elect Joseph R. Biden Jr.'s victory over incumbent President Trump. That certification proceeding was interrupted when an armed mob professing support for Trump violently attacked the Capitol to stop the certification of the vote. See ███████ Opinion at 2, 6.

Following those events and the subsequent reporting on them, Special Counsel Jack Smith was appointed, and a grand jury in the District of Columbia began to investigate whether the former President, his staff in the White House and his campaign, and other Executive Branch officials violated 18 U.S.C. §§ 1512(c)(2) and (k) (attempted obstruction of an official proceeding and conspiracy to obstruct an official proceeding), 1001(a)(2) (knowingly or willfully making a materially false, fictitious, or fraudulent statement or representation within the jurisdiction of the federal government), and 371 (conspiracy to commit offense or to defraud the United States), in their efforts "to reverse the results of the 2020 presidential election." ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



B. Grand-Jury Subpoena

On ███████████, the grand jury issued a subpoena to ████ seeking his testimony on "possible violations of federal criminal laws." ████████████████ The Government then notified the White House Counsel's Office of the subpoena the next day and inquired

whether President Biden would assert executive privilege to bar ▇ testimony. ▇ ▇ That letter also listed ▇ topics to be addressed during ▇ anticipated testimony. ▇

▇

▇

▇

▇

▇ The Counsel's Office responded one week later, notifying the Government that President Biden "will not assert executive privilege with respect to the grand jury appearance by ▇ regarding the topics" in the earlier letter. ▇ That letter explained that President Biden would not "assert executive privilege" regarding "efforts to thwart the orderly transition of power under our Constitution." ▇

The Government communicated the same request to the former President's counsel by letter on February 8, 2023, and similarly included the ▇ topics of ▇ anticipated testimony. ▇ The former President's counsel did not respond. ▇ Nevertheless, anticipating that Trump would — as he had done repeatedly in the past for other witnesses — instruct ▇ not to provide testimony he viewed to be protected by executive privilege, the Government filed this Motion to Compel to allow the Court to address the privilege claim in advance of ▇ testimony. ▇ As predicted, the former President intervened to oppose the Motion, contending that ▇ testimony was protected by the presidential-communications privilege.

4

████████████     ████████████████████████████████████████

████████████████

**II.     Legal Standards**

The Supreme Court has made clear that "[a] grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials."  United States v. R. Enters., Inc., 498 U.S. 292, 298 (1991) (internal quotation marks omitted).  "[T]he law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority," and thus "a grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." Id. at 300–01. The grand jury may seek information from "widely drawn" sources, and the duty to testify has been long recognized "as a basic obligation that every citizen owes his Government." United States v. Calandra, 414 U.S. 338, 344-5 (1974); see also id. (noting "citizens generally are not constitutionally immune from grand jury subpoenas and that the longstanding principle that the public has a right to every man's evidence is particularly applicable to grand jury proceedings") (alterations and internal quotation marks omitted) (quoting Branzburg v. Hayes, 408 U.S. 665, 682, 688 (1972)) (alterations and internal quotation marks omitted).

"The investigatory powers of the grand jury are nevertheless not unlimited," but subject to constraints imposed by Federal Rule of Criminal Procedure 17(c), "which governs the issuance of subpoenas *duces tecum* in federal criminal proceedings." R. Enters., Inc., 498 U.S. at 299; see Calandra, 414 U.S. at 346 (observing that "the grand jury's subpoena power is not unlimited").  This rule provides that, on motion, "the court may quash or modify the subpoena if

5

compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). A grand jury "may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law." Calandra, 414 U.S. at 346. "Judicial supervision is properly exercised in such cases to prevent the wrong before it occurs." Id.

**III. Analysis**

The Court will begin by providing an overview of executive privilege and the presidential-communications privilege. It will then turn to the application of this privilege to ▮▮▮▮▮▮▮▮▮▮▮▮▮ anticipated testimony before the grand jury.

A. Presidential-Communications Privilege

The former President seeks to block ▮▮▮ from providing testimony to the grand jury by invoking executive privilege. Such privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 447 (1977) (GSA). Article II of the Constitution vests in the President a broad array of powers including, among others, command of the military, see U.S. Const. art. II, § 2, cl. 1, the power to grant pardons for offenses against the United States, id., and conduct foreign diplomacy. Id. § 2, cl. 2; id. § 3. To ensure that the President can "effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process," Judicial Watch, Inc. v. Dep't of Just., 365 F.3d 1108, 1115 (D.C. Cir. 2004) (internal citations and quotation marks omitted), both the Constitution and common law recognize a need to keep confidential executive communications and deliberations. See also In re Sealed Case, 121 F.3d 729, 736-37 (D.C. Cir. 1997). The privilege granted to the executive branch has two distinct species, each derived from the same recognized need to protect

6

executive-branch decisionmaking, but with different scopes and prerequisites for application: the deliberative-process privilege and the presidential-communications privilege. See id. at 745.

As both parties confirm, at issue today is the latter. ███████████████████ ███████ This is a "constitutionally based privilege," Protect Democracy Project, Inc. v. Nat'l Sec. Agency, 10 F.4th 879, 885 (D.C. Cir. 2021), that applies to (1) "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the President or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," Judicial Watch, Inc., 365 F.3d at 1114 (internal citations omitted); and (2) communications that reflect "presidential decision-making and deliberations," id. at 1113, meaning "communications in performance of a President's responsibilities . . . of his office . . . and made in the process of shaping policies and making decisions." GSA, 433 U.S. at 449 (quoting United States v. Nixon, 418 U.S. 683, 708, 711, 713 (1977)) (formatting modified). Unlike the related deliberative-process privilege, which protects only "pre-decisional and deliberative material," the presidential-communications privilege is all encompassing. It applies to communications with the President that pertain to his official duties "'in their entirety,' including post-decisional and factual material within a record." Protect Democracy Project, Inc., 10 F.4th at 885–86 (quoting In re Sealed Case, 121 F.3d 745–46).

The presidential-communications privilege, however, is a qualified rather than an absolute privilege of immunity from the judicial process. Nixon, 418 U.S. at 706; GSA, 433 U.S. at 446; see also Protect Democracy Project, Inc., 10 F.4th at 886. The protections of that privilege can, accordingly, give way in certain circumstances. This is because any presumption of immunity from judicial process conferred on a President "must be considered in light of [the

7

Supreme Court's] historic commitment to the rule of law," Nixon, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . 'for they are in derogation of the search for truth.'" In re Sealed Case, 121 F.3d at 749 (quoting Nixon, 418 U.S. at 710).

The presidential-communications privilege, consequently, can be overcome based on a showing of specific need for the presumptively privileged communications. Under this Circuit's showing-of-need test, "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." In re Sealed Case, 121 F.3d at 754; see also id. at 759–62 (application of the two-prong test). Under the first prong, "important evidence" is evidence that is "directly relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not merely for the purpose of impeachment of witnesses or discussion of tangential issues. Id. at 754–55; see also Nixon, 418 U.S. at 701. The second prong requires a showing of "unavailability," meaning that the evidence sought "should not be treated as just another source of information," but rather that efforts were made to obtain the information elsewhere and those efforts were not fruitful. In re Sealed Case, 121 F.3d at 755.

Like the beasts in George Orwell's Animal Farm, not all presidential communications are created equal, and the showing required to overcome an exercise of the privilege varies based on the context of the communication. Three separate categories of presidential communications exist with varying levels of — or no — such protection. In descending order, communications that we may label "core communications" refer to those regarding military, diplomatic, or sensitive national-security secrets. See GSA, 433 U.S. at 446–47; Nixon, 418 U.S. at 706, 710;

8

In re Sealed Case, 121 F.3d at 743 n.12 (noting that Nixon "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, [but] expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This category would include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009).

Next is the category we may term "generalized communications," which covers communications relating to "the effective discharge of a President's powers." Nixon, 418 U.S. at 711; see also GSA, 433 U.S. at 446–47. Finally, communications with the President, even directly, fall completely outside of the protection of the privilege when the matters do not involve policy discussions with and decisionmaking by the President in the performance of his official duties. See Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 729 (D.C. Cir. 1974) (*en banc*) (noting premise of presidential-communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'") (quoting Nixon v. Sirica, 487 F.2d 700, 717 (D.C. Cir. 1973) (*en banc*)); cf. Nixon, 418 U.S. at 705.

B. ▬▬▬▬ Subpoena

The Court will now turn to the separate issues of whether the former President's invocation of the presidential-communications privilege applies to the anticipated testimony of ▬▬▬▬▬▬▬▬▬▬▬▬ and, if so, whether and to what extent that privilege is overcome by the Government's showing of need. In such analysis, the Court assumes without deciding that a former President may invoke such privilege in the first place.

9

### 1. *Scope of Privilege*

To begin, the parties dispute which category, if any, applies to the communications the Government seeks to compel from ▆▆▆▆▆▆▆▆ and thus what showing of need it must make. The prosecution here urges — notwithstanding its alternative arguments about ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ — that the Court should assume that the President has only a generalized interest in confidentiality. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Trump, conversely, argues that "more than just a generalized interest in confidentiality" applies to the presidential communications in question, and that ▆▆▆ subpoena should trigger an "<u>absolute</u>, <u>unqualified</u> Presidential privilege of immunity from judicial process," ▆▆ (quoting <u>Nixon</u>, 418 U.S. at 706) (internal quotation marks omitted), given the testimony's relationship to "sensitive matters of national security" and the need for the President to have ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆ To support this assertion, he first highlights  The former President then declares that the specific domain of "[e]lection security matters . . . implicate[s] national security," ▆▆▆ and thus further supports an "impermeable" version of executive privilege when it comes to ▆▆▆▆▆▆ conversations with the President. ▆ The Court does not concur.

To begin, the former President is not entitled to nearly "absolute" protection under the presidential-communications privilege even for national-security matters. <u>Nixon</u> itself does not purport to create an "absolute, unqualified" privilege for such topics. On the contrary, the Court

there acknowledged that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more," could sustain such a privilege. See 418 U.S. at 706. The Court noted only that "military or diplomatic secrets" require a court to show "the utmost deference to Presidential responsibilities." Id. at 710 (citing United States v. Reynolds, 345 U.S. 1, 73 (1953), a case about state-secrets privilege which is not at issue here). The Government further contends that what Trump is really attempting to assert is not a claim of privilege over "core communications" of the President but, rather, the near-absolute state-secrets privilege. ▮▮▮▮▮▮ Trump, however, has never formally invoked that privilege. See United States v. Zubaydah, 142 S. Ct. 959, 969 (2022) (noting that "Government initially must formally invoke the [state-secrets] privilege").

In any event, the Court need not get bogged down in the details, because even if such an absolute, unqualified privilege for the President's national-security conversations theoretically existed, the communications sought here are very unlikely to require ▮▮▮ to reveal confidential military or diplomatic secrets. Nor does the former President claim that they concern classified information that would risk damage to national security if disclosed. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

11

There is no reason to believe, based on the topics identified by the grand jury's subpoena, that "█████ would be asked to reveal military or state secrets concerning the nation's defense capabilities, intelligence-gathering methods or capabilities, or diplomatic relations with foreign governments." ████████. To the extent that Trump maintains that conversations about election security and integrity necessarily implicate core military, diplomatic, or national-security secrets and require sweeping protection, the Court disagrees.

As a last-ditch effort to reach for an absolute privilege covering his conversations with ████ Trump proposes an entirely novel carve-out category of "[a]bsolute [p]rotection" for presidential communications involving ████████ ████████. That position misunderstand that the privilege's protections do not turn on who else is involved in the communications with the President.

At the end of the day, the communications at issue implicate only the former President's <u>generalized</u> interest in confidentiality. While such communications are presumptively privileged as presidential communications, they may be overcome by a showing of specific need.

    2.    *Showing of Need*

As a result, the Court next asks whether the Government has sufficiently overcome the presidential-communications privilege to warrant compelling the witness to testify fully before the grand jury. As a refresher, "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." <u>In re Sealed Case</u>, 121 F.3d at 754.

12

a. Important Evidence

Under the first prong, "important evidence" for the grand jury is evidence that is "directly relevant to issues that are expected to be central to the trial" and is of clear probative value, not merely for the purpose of impeachment of witnesses or discussion of tangential issues. Id. at 754–55. Assessing the grand jury's specific need for ▌ testimony involves examining both the matters under investigation and whether the testimony could potentially shed light on those matters.

The grand jury is "seeking important evidence relating to the involvement, if any, of the former President, White House advisors, Executive Branch officials, campaign staff, outside attorneys, and others in efforts to unlawfully overturn the presidential election, including by obstructing Congress' certification of the electoral results." ▌ In this proceeding, as in prior ones, the Government disclosed to the former President topics of investigative interest. ▌

As to whether ▌ testimony could shed important light on those matters, the answer is clearly yes. ▌

13



As a result, the content of these meetings — and so ▮▮▮ testimony about them — is highly relevant to the charges the grand jury is investigating. ▮▮▮▮▮▮ ▮▮▮▮▮▮ which requires the grand jury to determine whether any subject acted knowingly and corruptly. See United States v. Gordon, 710 F.3d 1124, 1151 (10th Cir. 2013); United States v. Sandlin, 575 F. Supp. 3d 16, 32 (D.D.C. 2021); see also United States v. Reffitt, No. 21-32, ECF No. 119 (Jury Instructions) at 25-26 (D.D.C. Mar. 7, 2022) (Section 1512(c)(2) instructions). As this Court's predecessor has previously held with respect to other executive-branch witnesses, testimony from ▮▮▮ "will assist the grand jury in

14

assessing factual and *mens rea* requirements and may lead the grand jury to concur with the former President that no criminal wrongdoing occurred at all or to find probable cause of criminal misconduct attributable to one or more individuals whose conduct is examined." ▇ ▇ Opinion at 29.

The first prong of the need standard is conclusively established.

b. Availability Elsewhere

To next establish unavailability, the Government must show that it has made efforts to obtain the relevant information elsewhere and been unsuccessful. In other words, it must not be seeking "just another source of information." In re Sealed Case, 121 F.3d at 755.

The Government begins by emphasizing that, in many instances, ▇ is withholding testimony about conversations where ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. On top of that, ▇ was ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇ For these conversations, it is clear that the Government is not seeking "just another source of information" and can obtain the relevant material *only* through ▇ subpoenaed testimony.

▇ was not a party to just one-on-one communications with the President, however. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. In these group conversations, the former President argues, the grand jury can find the information sought from other parties to those discussions. In fact, Trump points out that other executive-branch officials ▇▇▇▇ ▇▇▇▇

15

█████, ████████████████ ████████████████████

█ have all testified before the January 6 Committee ████████████████

██████. ████████████

This argument is unpersuasive for at least two independent reasons. First, as this Court's predecessor has repeatedly noted in prior decisions, the need for the Government to "corroborate events about which other witnesses may have already testified," ████████ Op. at 45, particularly as they relate to the key elements of the crimes the grand jury is investigating, can support the necessity of the testimony in question. Cf. Smith v. United States, 384 U.S. 147, 157 (1954) (noting in tax-evasion case the importance of "corroborat[ion] by substantial independent evidence" to prove fraudulent conduct). As the Government points out, moreover, ██████ ████████ have demonstrated that such corroboration ends up revealing new information describing what happened in meetings with Trump. ████████████████████ ████████████████████████████████████████████████ ████████████. ████████████████████████ testimony about events would also carry particular and unmatched weight for the grand jury.

Second, even in meetings where others were present and could provide consistent recollections, ████████████ subjective impressions hold special weight in this investigation. The specific charges the grand jury is examining include 18 U.S.C. §§ 1512(c)(2) and (k) for attempted obstruction of an official proceeding and conspiracy to obstruct an official proceeding. The subjective impressions and reactions of ████████████ in his meetings with the former President — ████████████████████████ ████████████████████████ — are therefore highly relevant to whether Trump knowingly and corruptly attempted to obstruct an official proceeding. Those impressions would

16

be unavailable to any other witness to those conversations as they would be ▮ and ▮ alone.

Finally, Trump's position arguably hamstrings the Government's ability to build its case. Because the presidential-communications privilege protects communications not just between the President and ▮ but, rather, communications between the President and any advisor, every party to those group conversations would similarly be able to argue that the privilege should not be defeated because the information is available from a different member of those conversations. Trump has in fact instructed every member of the executive branch who has been subpoenaed to testify before the grand jury to withhold information that the former President believes to be privileged. ▮. Under this logic, no one could be required to testify.

That said, it is possible that some conversations occurred in which ▮ was a part of a larger group and where his subjective impressions or reactions to the conversation are not particularly relevant. In those instances — and where several others in the group have testified and the cumulative weight of that testimony is beyond what is necessary for corroboration — the Court finds that the information is not so unavailable as to justify piercing the presidential-communications privilege.

\* \* \*

In sum, the Government has shown both that ▮ testimony would likely be a source of important information for the grand jury and that such information would be unavailable elsewhere, subject to the exceptions just outlined. This showing is sufficient to overcome the presidential-communications privilege. Finally, if, contrary to the Government's expectation, certain questions posed during testimony would necessarily elicit answers containing classified

17

military or foreign-intelligence information, ▮▮▮▮▮▮▮▮▮▮▮▮ may refuse to answer, and the Government can decide whether it wishes to litigate the matter further with the Court.

## IV. Conclusion

For the foregoing reasons, the Court will grant in the main the Government's Motion to Compel Grand Jury Testimony.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: March 25, 2023